William E. HUGHES, Appellee,

v.

Alan S. WHITMER, Appellant.

Nos. 82–1338 and 82–1538.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 14, 1982.

Decided Aug. 4, 1983.

Rehearing and Rehearing En Banc
Denied Sept. 15, 1983.

**1408**

John Ashcroft, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, Mo., for appellant.

Alex Bartlett, Roger K. Toppins, Bartlett, Venters & Pletz, P.C., Jefferson City, Mo., R. Jack Garrett, R. David Ray, Law Offices of R. Jack Garrett, West Plains, Mo., for appellee.

Before McMILLIAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

The Superintendent of the Missouri Highway Patrol (Superintendent)[1] appeals from a final judgment entered in the District Court for the Western District of Missouri permanently enjoining the Missouri Highway Patrol (Patrol) from transferring appellee Trooper William E. Hughes without first providing him with a due process name-clearing hearing. For reversal, the Superintendent argues that Trooper Hughes' transfer from a rural troop to an urban troop did not violate Hughes' fourteenth amendment rights because Hughes has no property or liberty interest in a

---

1. During the relevant events leading to this lawsuit, Alan Whitmer was the Superintendent of the Missouri Highway Patrol. After the district court issued its opinion, Howard Hoffman became the Superintendent.

particular geographic assignment within the Patrol. Although the district court did not specifically address Hughes' first amendment claim, Hughes urges on appeal that his first amendment rights were violated because the transfer was ordered to retaliate against him for his protected speech-related activities. For the reasons discussed below, we reverse the district court's judgment. 537 F.Supp. 93.

## I. *Factual Background*

Trooper Hughes has been a member of the Patrol since 1970 and has spent almost all of his career assigned to Troop "G." Troop "G" is headquartered in Willow Springs, Missouri, and its members patrol the highways in the surrounding nine counties of south central Missouri. Hughes and his family have lived in Willow Springs during Hughes' ten-year tenure in Troop "G."

On Friday afternoon, October 16, 1981, Hughes was summoned to Troop "G" headquarters. When he arrived, Hughes was ushered into Captain McKee's office and told by Major Hoffman of Patrol headquarters that he was being transferred to Troop "C," at state expense, effective Monday, October 19, 1981. Troop "C" is a relatively urban assignment encompassing the counties surrounding the City of St. Louis. Its headquarters are in Kirkwood, Missouri, which is some 200 miles from Willow Springs.

Hughes reported for duty at Troop "C" on Monday, October 19, 1981, as ordered. Hughes was never notified officially of any complaint against him prior to the Superintendent's decision to order the transfer. Nor was Hughes given an opportunity to meet any of the charges against him or refute any of the factors which entered into the Superintendent's decision to transfer him. Hughes still has not received written reasons for his transfer. His transfer order merely states that he is being transferred at state expense from Troop "G" to Troop "C" effective October 19, 1981.

Superintendent Whitmer, the ultimate transferring authority, Major Hoffman, whom the Superintendent ultimately relied upon in making the transfer decision, and Captain McKee of Troop "G" testified that the transfer was made to resolve a debilitating troop morale problem resulting from an intense personality dispute between Hughes and Lt. Elmore. Lt. Elmore was in charge of staff functions at Troop "G" headquarters but was not in the chain of command over Hughes.

Major Hoffman, who conducted interviews with a number of Troop "G" patrolmen, concluded that the major source of the friction between Hughes and Elmore was Hughes' investigation of Elmore's twenty-four-year-old son. Hughes suspected that Elmore's son was involved in illicit drug trafficking. Hughes reported these suspicions to Captain McKee, who in turn told Hughes to continue the investigation. As Hughes continued his investigation, he suspected that Lt. Elmore was leaking information about the investigation to his son. Hughes apparently told other Troop "G" officers about his suspicions regarding Lt. Elmore and made accusations regarding Elmore's son's involvement in drug activities. Hughes also told a Willow Springs neighbor that the neighbor's sixteen-year-old daughter had been seen at Lt. Elmore's house with Elmore's son. Elmore's son was married to another woman at the time. During their interviews with Hoffman, various Troop "G" officers expressed the view that Hughes had become too personally involved in Elmore's family affairs, hindering his own job performance and causing disharmony within the Troop. After learning about Hughes' various investigations and accusations, Lt. Elmore reciprocated by conducting his own investigation of Hughes and by indicating his intention to file a defamation of character suit against Hughes.

At trial Hughes testified that he was transferred in retaliation for the Elmore investigation and his various other investigations. One of these other investigations involved the Mountain View Airport. Hughes was approached by three Mountain View citizens with information about suspicious late night airplane landings and take-offs on a remote segment of the airport's

runway. Hughes testified that he received information that a pilot had been offered a large sum of money to fly drugs in and out of the Mountain View Airport. Hughes passed this information to Captain McKee, who encouraged Hughes to conduct a surveillance at the airport. Later, a state representative whose plane was housed at the Mountain View Airport complained about Hughes' surveillance to Superintendent Whitmer. Despite this complaint, Captain McKee encouraged Hughes to continue the investigation and, at Hughes' request, placed a call to Jefferson City for special night surveillance equipment to aid in identifying the airplanes making night flights. Hughes testified that soon after he made the request for surveillance equipment, the suspicious night flights ceased. Hughes never again requested or received the night surveillance equipment. Hughes testified that he spent an entire year on his airport surveillance without finding any tangible evidence of impropriety.

Hughes also testified that he had received information that Captain McKee was involved in a ticket-fixing incident some six years ago. Captain McKee denied having ever fixed any traffic ticket. Hughes also testified that he had received information that Captain McKee and Lt. Hickman were involved in a cover-up of a prisoner abuse incident. Hughes referred to a report written by Trooper Mitchell and Sergeant Zorsch indicating that an officer had allegedly struck an arrestee. Captain McKee allegedly concealed this report and, after interviewing the officer involved in the alleged beating, collaborated with Lt. Hickman in writing another report discrediting the arrestee's allegations. Sergeant Zorsch testified that while he believed some of the arrestee's allegations were true, Captain McKee could have reasonably reached a different conclusion and was not trying to coverup something.

Hughes testified that he told his wealthy industrialist friend, Claud Trieman, a member of the Governor's Crime Commission,

about the alleged ticket fixing and prisoner abuse incidents.[2] Hughes did so in the hope that his friend could intercede with the higher echelon at Patrol headquarters to initiate some reform in Troop "G." Superintendent Whitmer and Major Hoffman testified that they were completely unaware of Hughes' suspicions of improprieties in Troop "G." Hughes testified that he never told Hoffman or anybody else within the Patrol's command staff about his suspicions.

Over the past few years Hughes also became involved in other incidents of some concern to the community and to his fellow officers. In 1977, while patrolling a wooded area, Hughes discovered two teachers engaged in a "compromising assignation." Hughes, while off-duty, reported this encounter to the school board. In 1979, Hughes was reprimanded for openly accusing a local postal employee of slashing the tires of Hughes' car without sufficient evidence to support his accusations. These accusations were made while Hughes was off-duty. Hughes was also criticized by some of his fellow officers for spending too much time patrolling the Mountain View area so that he could associate with his wealthy industrialist friend, Claud Trieman, while on duty and for filing baseless written reports accusing radio operators of dereliction of duty. Finally, some officers, including Lt. Hickman and Captain McKee, suspected that Hughes furnished a local sheriff with a copy of a Patrol investigation of the sheriff's alleged involvement in a timber theft.

On October 3, 1981, Lt. Elmore met with Superintendent Whitmer and suggested that Hughes be transferred to Troop "C." Superintendent Whitmer testified, however, that no decision concerning Hughes was reached at this meeting. It is unclear from the record when the decision to transfer Hughes was actually reached. Superintendent Whitmer was uncertain about the exact date, but surmised it was Thursday, October 15, 1981. Major Hoffman testified that the decision was made the morning of

---

**2.** Hughes also enlisted the aid of this friend in Hughes' unsuccessful bid to become Superin-

tendent of the Patrol. Major Hoffman became and is now the Superintendent of the Patrol.

October 16, 1981, the day Hughes was told of the decision.

In any event, on October 4, Elmore returned to Troop "G" and told several troopers that he was having Hughes transferred to Troop "C." Dissension then began to mount in Troop "G" as troopers took sides over the rumored transfer of Hughes. Around October 7, Captain McKee testified that he reported this dissension to Major Hoffman. Major Hoffman then investigated the matter, interviewed a number of Troop "G" officers, and wrote a report, dated October 13, 1981, in which he concluded that there was a serious morale problem in Troop "G" because of the conflict between Lt. Elmore and Trooper Hughes. Major Hoffman recommended that both Elmore and Hughes be transferred to correct the situation.

Almost simultaneously with Major Hoffman's investigation, Lt. Elmore wrote his own memorandum entitled "Disciplinary Action—Trooper W.E. Hughes." In this memorandum Elmore stated that Hughes had caused Troop "G" to lose its effectiveness because of Hughes' "seemingly uncontrollable actions" and recommended that Hughes be transferred. These "uncontrollable actions" included Hughes' investigation of Elmore's son, Hughes' close relationship with Claud Trieman, and Hughes' "actions toward other public and private individuals."

Lt. Hickman added his own remarks to Lt. Elmore's memorandum and also recommended Hughes' transfer. Hickman noted that Hughes never consulted him regarding the investigation of Elmore's son and that Hughes was spending too much of his time patrolling the Mountain View area, where an officer was already stationed. Hickman added his suspicion that Hughes had given a local sheriff a copy of a Patrol investigation report concerning the sheriff.

Captain McKee also attached his remarks to this memorandum, suggesting that because the intense bitterness between Hughes and Elmore was disrupting the entire troop, Hughes should be transferred at state expense to another troop. McKee also noted Hughes' various "controversial actions," including his report about the two school teachers, his foundless accusations that a fellow resident had slashed Hughes' car tires, and his on-the-job association with Claud Trieman in the Mountain View area who allegedly was to help Hughes in his bid to become Superintendent. McKee also wrote another report in which he recommended that Lt. Elmore also be transferred because he had contributed to dissension in Troop "G."

Superintendent Whitmer endorsed the reports written by Major Hoffman and Captain McKee. Whitmer also signed the memorandum that included the recommendations of Lt. Elmore, Lt. Hickman, and Captain McKee. Whitmer, believing that both Hughes and Elmore had contributed to dissension in the troop, transferred Hughes to Troop "C," effective October 19, 1981, and transferred Lt. Elmore to Troop "D," effective November 1, 1981. Hughes was offered moving expenses and was provided the same job status and pay in Troop "C" as he had enjoyed in Troop "G."

Two weeks after the transfer decision, Hughes filed this § 1983 suit in federal district court claiming that the state's failure to provide him with a name-clearing hearing violated his substantive and procedural fourteenth amendment due process rights as well as his right to equal protection. U.S. Const. Amend. XIV. Hughes also alleged that he was transferred in retaliation for exercising his first amendment rights. The district court held that Hughes' transfer was disciplinary and, therefore, under Missouri law, Hughes was entitled to a due process hearing before he could be transferred. The district court enjoined the Patrol's order transferring Hughes to Troop "C" until the Patrol provides Hughes with a hearing. This appeal ensued.

II. *Due Process*

The district court below believed that the dispositive issue in this case was whether or not Hughes' transfer was disciplinary. For if it was disciplinary, the district court reasoned, Mo.Rev.Stat. § 43.-120, .150 (1978) and Patrol General Order

V–16–104 require that a hearing be held before the disciplinary action can be carried out. This analysis would have been correct if the district court had been sitting in a diversity case governed by Missouri law. But Hughes brought suit under 42 U.S.C. § 1983 (1976) alleging that he was deprived of his fourteenth amendment right to due process under color of state law. The necessary predicate to such a suit is establishing that the plaintiff had a legitimate claim of entitlement to an identifiable property or liberty interest.[3] *Board of Regents v. Roth,* 408 U.S. 564, 571, 577, 92 S.Ct. 2701, 2706, 2709 33 L.Ed.2d 548 (1972); *Brockell v. Norton,* 688 F.2d 588, 590–91 (8th Cir.1982). Hughes' brief on appeal and the district court's opinion below, however, do not identify any liberty or property interest to which Hughes was legitimately entitled under state law.

A. *Property*

■ For Hughes to have a due process property interest in his assignment to Troop "G," he must identify some rule or mutually explicit understanding that supports his claim of entitlement to a Troop "G" assignment, and that he may invoke at a hearing. *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). A clause in a written contract guaranteeing a trooper's preferred assignment would be the classical way of showing a mutually explicit understanding. *Id.* But Hughes offered no evidence that he has a contract with the Patrol. A statute or agency regulation may also provide the basis of a mutually explicit understanding. *Bishop v. Wood,* 426 U.S. 341, 344–45, 96 S.Ct. 2074, 2077–2078, 48 L.Ed.2d 684 (1976). The pertinent Missouri statutes, however, only guarantee that a trooper will not be dismissed from the Patrol absent "cause." While this language may support Hughes' claim of entitlement to continued employment with the Patrol, *see Bishop v. Wood,* 426 U.S. at 345 & n. 8, 96 S.Ct. at 2078 & n. 8, it does not guarantee Hughes the infeasible right to remain in a particular troop within the Patrol. *Arnett v. Kennedy,* 416 U.S. 134, 151–52, 94 S.Ct. 1633, 1642–1643, 40 L.Ed.2d 15 (1974). To the contrary, Mo.Rev.Stat. § 43.120(1) (1978) empowers the Superintendent of the Patrol to "assign members of the patrol to such districts in the manner he deems proper .... He shall have authority in his discretion to call members of the patrol from one district to another." In reviewing a similar statutory scheme, the Seventh Circuit concluded that a Chicago-police officer had no property interest in a particular geographic assignment because the applicable Illinois statute protecting police officers from adverse action without cause was limited by its own terms to discharges and suspensions. *Confederation of Police v. Chicago,* 547 F.2d 375, 376 (7th Cir.1977). Similarly, Mo.Rev.Stat. § 43.150 is limited by its own terms to dismissals. Therefore, we hold that applicable Missouri statutes and Patrol general orders do not support Hughes' claim that he has a property interest in his assignment to Troop "G." [4]

■ A property interest also may be manifested by an employer's historical practices and conduct which rise to the level of a "common law" of the employment relationship that both parties recognize as establishing their respective rights and responsibilities. *Perry v. Sindermann,* 408 U.S. at 602, 92 S.Ct. at 2700. An employee's unilateral expectations spawned by the regularized practices of his employer will not do. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Here, a Missouri statute specifically gives the Superintendent the power to transfer troopers at his discretion. Additionally, Hughes was told at the Patrol Academy that he was subject to transfer anywhere in the state, with or without cause. The Missouri statute, coupled with the Patrol's practice of telling all new troopers that they can be transferred at will, negates a finding that there is a *mutually* explicit understanding between the Pa-

---

**3.** Both parties stipulated that Superintendent Whitmer acted under color of state law in ordering Hughes' transfer.

**4.** *See* discussion *infra* at 1414–1416.

trol and its members that a trooper is entitled to a permanent assignment that is indefeasible except for cause. *Perry v. Sindermann,* 408 U.S. at 602 & n. 7, 92 S.Ct. at 2700 & n. 7. Hughes, therefore, has no due process property interest in his assignment to Troop "G." At best, he has exhibited an unilateral hope of permanent residence in Willow Springs.

### B. *Stigma, Liberty and the Right to a Name-Clearing Hearing*

Hughes does not contend, and the district court did not find, that Hughes has a liberty interest in being assigned to Troop "G." Rather, what the district court decided and what Hughes argues on appeal is that, under Missouri law, the Patrol must give him a hearing before any disciplinary action can be taken against him. Therefore, the Patrol's failure to provide him with a hearing violated his constitutional rights as protected by § 1983. *Hughes v. Whitmer,* 537 F.Supp. 93, 97 (W.D.Mo.1982). We disagree both with the premises and the conclusions inherent in Hughes' argument.

#### 1. *Right to a Pre-Disciplinary Transfer Hearing Under Missouri Law*

The district court below ruled that, as Mo.Rev.Stat. § 43.120, .150 and Missouri Highway Patrol General Order V–16–104 "make manifest, any member of the Patrol who is confronted with the threat of disciplinary action is entitled to written notification of the charges against him, a hearing before a disciplinary board, and an appeal to the Superintendent of any disciplinary action taken by the board." *Hughes v. Whitmer,* 537 F.Supp. at 95. There are no Missouri cases interpreting Mo.Rev.Stat. § 43.120, .150 or Patrol General Order V–16–104 that are on point.[5]

Section 43.120 of the Missouri Revised Statutes gives the Superintendent of the Patrol broad authority and discretion to prescribe rules for disciplining Patrol members. Where the Superintendent seeks to dismiss a trooper, however, his discretion is limited by Mo.Rev.Stat. § 43.150. Section 43.150 provides that after a one-year probationary period, members of the Patrol are

> subject to removal only for cause after a formal charge has been filed in writing before or by the superintendent and upon a finding by a majority of a board of five members.... Within thirty days after the petition is filed, the board shall conduct a hearing and report to the superintendent the finding by the majority of the board, whether the charges are true and if sufficiently serious to warrant removal.... [M]embers of the patrol ... shall be subject to dismissal as provided or such lighter punishment as suspension ... fine, reduction in rank, forfeiture of pay, or otherwise as the superintendent may adjudge.

■ Section 43.150, by its own terms, requires a showing of cause after a formal hearing only when a trooper's removal is sought. Under Missouri rules of statutory construction, the express mention of one thing (removal for cause in this case) implies the exclusion of all other things (in this case disciplinary transfers). *Harrison v. MFA Mutual Insurance Co.,* 607 S.W.2d 137, 146 (Mo.1980) (banc); *Giloti v. Hamm-Singer Corp.,* 396 S.W.2d 711, 713 (Mo.1965). If the Missouri legislature had intended to require the Superintendent to show cause before taking any other type, or all other types, of disciplinary action, it would have been a simple matter to have done so by stating that non-probationary troopers "are subject to disciplinary action for cause." *De Poortere v. Commercial Credit Corp.,* 500 S.W.2d 724, 727 (Mo.App.1973). The Statute, however, only mentions one type of disciplinary action—"removal."

---

5. Where there is no state court precedent, ordinarily we will give substantial weight to the interpretation of the district court judge who sits in the *lex loci* state. *Bishop v. Wood,* 426 U.S. 341, 345–46, 96 S.Ct. 2074, 2077–78, 48 L.Ed.2d 684 (1976). But, because the parties have an equal right to have questions of state law reviewed on appeal, we are not bound by the district court's interpretation, or to a clearly erroneous standard of review. *Luke v. American Family Mut. Ins. Co.,* 476 F.2d 1015, 1019 & n. 6 (8th Cir.1973).

This interpretation is butressed by the Patrol's General Order V–16–104 issued on February 20, 1975. It is divided into seven major sections. The first quotes relevant statutory authority, including § 43.-120, .150. Section II provides procedures for processing general complaints against Patrol members.[6] Section III deals with a supervisory officer's responsibility and authority to discipline subordinates.[7] Section IV gives the disciplined trooper the right to appeal the disciplinary action to the superintendent.

None of these sections grants a trooper a due process hearing before disciplinary action short of dismissal may be assessed against him. The only section which does afford a trooper a pre-disciplinary hearing is Section V. Section V requires a pre-disciplinary hearing whenever formal charges are brought against a member of the Patrol. Formal charges are prepared, however, only "when a violation is of such a nature that dismissal may be the outcome." General Order V–16–104, § V(A). Therefore, under the disciplinary procedures outlined in the General Order, a trooper may demand a formal hearing only when the Patrol recommends removal. In fact, in enforcing § 43.120, .150, the Patrol has never given a trooper a predisciplinary transfer hearing when the trooper's dismissal was not sought. Absent a prior judicial construction of the statute, this interpretation of the statue by the administrative agency charged with the responsibility of enforcing it, will be given considerable weight. *Smith Beverage Co. v. Reiss,* 568 S.W.2d 61, 67–68 (Mo.1978) (banc); *Foremost-McKesson, Inc. v. Davis,* 488 S.W.2d 193, 197 (1972) (Mo. banc). *See also Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796–797, 63 L.Ed.2d 22 (1980); *Dymond v. United States Postal Service,* 670 F.2d 93, 96 (8th Cir.1982). Accordingly, we conclude that under Missouri law, a member of the Patrol has no protectable interest in a predisciplinary hearing unless the member's removal is recommended or the member is accused of a violation that is of such a nature that dismissal may be the outcome. Thus, because the fourteenth amendment does not create due process property or liberty interests apart from those protected under state law, Hughes has not proven a violation of his fourteenth amendment rights. *Roth,* 408 U.S. at 578–79, 92 S.Ct. at 2709–2710.

### 2. *Stigma and Liberty*

At trial, Hughes presented evidence that his transfer stigmatized him in the eyes of both his peers in the Patrol and his neighbors in the Willow Springs community. In effect, Hughes argues that this stigma ad-

---

**6.** Whenever a troop commander receives an accusation that someone under his command has violated a law, rule, regulation, or order, Section II requires him to appoint an investigator. The investigator has the responsibility of contacting the complainant in person and forwarding a complete written report through channels to the superintendent. The report must classify the complaint as either: Unfounded, Exonerated, Not Substantiated, or Substantiated. The superintendent then determines what disciplinary action, if any, will be taken. The accused trooper is to be advised of the complaint against him and *may be* directed to give his written version of the facts. After the trooper is advised of the nature of the disciplinary action, he may appeal under Section IV of the General Order.

**7.** Section IIIA gives supervisory personnel the responsibility of disciplining subordinates within the supervisor's direct line of command. If, after investigating the incident, the supervising officer feels that the penalty to be recommended or assessed is more serious than an oral reprimand, he must make a report through channels. Under Section IIIB, if the supervisory officer is a corporal or above, he may make an oral reprimand or impose an emergency suspension for the remainder of the accused trooper's tour of duty. If the supervisory officer is a sergeant or above he may assess a fine up to $50.00 or recommend a disciplinary transfer, suspension up to 30 days, or dismissal. If the supervisory officer is troop commander or above, he may accept the trooper's written resignation and "take immediate steps toward terminating an employee if the employee desires to tender his resignation rather than submit to further investigation and a hearing," or file formal charges. Short of dismissal, or filing of formal charges, a troop commander or above need only inform the effected trooper of the nature of the disciplinary action before imposing it.

versely affected his liberty interest in his reputation and also his ability to gain promotion within the Patrol. Therefore, Hughes claims that his transfer without a hearing deprived him of liberty without due process of law in violation of the fourteenth amendment.

■■■ To prevail, Hughes must show more than an injury to his reputation caused "by what the government is doing to him." *See Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). Under the Supreme Court's decision in *Paul v. Davis,* 424 U.S. 693, 708, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976), the offending state action must deprive the stigmatized person of a right to a benefit previously held under state law. Even if we assume for the sake of argument that Hughes' transfer publically communicated the impression that Hughes had committed a serious infraction, we conclude that Hughes has failed to show some change of legal status that occurred in conjunction with the release of the stigmatizing information.

■■■ The theoretical foundations of *Paul v. Davis*'s "change in legal status" requirement are unclear. But whether legal status serves as a tangible benchmark of a liberty deprivation serious enough to merit federal due process protection, or it is a reflection of a state's protection of some interest beyond a common law tort cause of action for damages, the Supreme Court has ruled that without a change of legal status, a stigmatized public employee's cause of action is simply one for defamation under state law and is for the state courts to entertain.[8] *See Meachum v. Fano,* 427 U.S. 215, 226,

228–29, 96 S.Ct. 2532, 2539, 2540–2541, 49 L.Ed.2d 451 (1976). Thus, the Court has made it clear that the constitution does not require the government to give to its stigmatized employee a hearing if the public employee remains a public employee. *See Paul v. Davis,* 424 U.S. at 710, 96 S.Ct. at 1164–1165. Several Courts of Appeals have held that a public employee's failure to be promoted[9] or internal transfer does not implicate a due process liberty interest as envisioned by *Paul v. Davis. See, e.g., Blevins v. Plummer,* 613 F.2d 767, 768 (9th Cir.1980) (promotion); *Moore v. Otero,* 557 F.2d 435, 438 (5th Cir.1977) (transfer); *Sullivan v. Brown,* 544 F.2d 279, 283 (6th Cir.1976) (transfer). We agree and hold that the "internal transfer of an employee, unless it constitutes such a change of status as to be regarded essentially as a loss of employment, does not provide the additional loss of a tangible interest necessary to give rise to a liberty interest meriting protection under the due process clause of the fourteenth amendment." *Moore v. Otero,* 557 F.2d at 438.

### III. *First Amendment*

■■■ Having granted the injunction on due process grounds, the district court did not explore Hughes' claim that his transfer was an unconstitutional reprisal against him for the exercise of his first amendment rights. Even though the fourteenth amendment does not create any protectable interests, it does protect interests derived from independent sources—such as the first amendment. *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Brockell v. Norton,* 688 F.2d

---

**8.** The district court below was of the opinion that 42 U.S.C. § 1983 gave it jurisdiction to enforce state law personnel procedures, *citing Doe v. Hampton,* 566 F.2d 265, 271–72 (D.C. Cir.1977) and *Villareal v. EEOC,* No. 80–0992 CVW2, Adopted Magistrate's Report and Recommendation Denying Plaintiff's Motion for Preliminary Injunction at 8–9 (W.D.Mo. July 20, 1981). The district court's reliance on these two cases is misplaced. Both *Hampton* and *Villareal* were cases brought under the court's general federal question jurisdiction, 28 U.S.C. § 1331 to adjudicate the plaintiff's rights under federal civil service laws. *See, e.g.,* 5 U.S.C.

§§ 706(2)(E), 7502–03, 7510, 7512–13, 2302; 5 C.F.R. § 771.307(b) (1977). Without an identifiable fourteenth amendment liberty or property interest, a federal court has no jurisdiction under 42 U.S.C. § 1983 to enforce state employee procedural rights that are created by state law.

**9.** Evidence was adduced at trial that at least one other trooper who had received a disciplinary transfer had been promoted after he was transferred.

588, 592 & n. 7 (8th Cir.1982). The first amendment restrains the government from retaliating against a public employee on the basis of the employee's speech or associations. *Perry v. Sindermann*, 408 U.S. at 593, 92 S.Ct. at 2694; *see Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–575, 50 L.Ed.2d 471 (1977). In this case, the record before us is sufficient to dispose of Hughes' claim that he was retaliated against for exercising his first amendment rights.

First, the evidence clearly shows that the transfer was designed to resolve a substantial and debilitating morale problem in Troop "G." The Superintendent's determination that Hughes' conduct contributed to the morale problem was rational and, even though the transfer may have been indirectly traceable to Hughes' arguably speech-related investigation of Elmore's son, we nevertheless view the transfer as a reasonable nonpunitive and nondiscriminatory means of achieving the Patrol's significant interest in maintaining discipline and harmony. *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–1735, 20 L.Ed.2d 811 (1968); *Kelley v. Johnson*, 425 U.S. 238, 246–47, 96 S.Ct. 1440, 1445–1446, 47 L.Ed.2d 708 (1976). The Superintendent has the statutory authority to transfer personnel and is also charged with the overall operation of the Patrol, which is basically a paramilitary organization. The courts under our constitutional tripartite division of powers lack the right to transfer personnel in administrative or executive functions. The courts are not only ill-equipped to administer governmental functions that properly belong to the executive branch but were not set up for that purpose; neither should the courts attempt collaterally to influence executive functions by

specifying when, where, and why certain individuals should or should not be transferred.[10]

Second, the record clearly shows that the transfer was not attributable to Hughes' legitimate whistle-blowing activities concerning alleged corruption in Troop "G," his surveillance of the Mountain View Airport, or his "political" association with Claud Trieman.

### A. *The Pickering Balance*

While government employees do not relinquish their first amendment rights when they enter public service, those rights, unlike the rights of the citizenry-at-large, are subject to the state's paramount interest in promoting the efficiency of the public services it performs through its employees. *Rosado v. Santiago*, 562 F.2d 114, 117 (1st Cir.1977); *Santos v. Miami Region, U.S. Customs Service*, 642 F.2d 21, 25 (1st Cir. 1981). As the Supreme Court emphasized in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–1735, 20 L.Ed.2d 811 (1968), "the state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Accordingly, public employers may legitimately curtail the speech activities of their employees to promote efficiency, loyalty, and departmental morale, provided these interests outweigh the employees' speech interest. *Id.* Therefore, in determining whether the transfer here infringed Hughes' first amendment rights, our duty as enunciated by the Court in *Pickering* is to weigh Hughes' interests in speaking and gathering information against the Patrol's interest in promoting efficiency, discipline and morale.[11] In weighing these interests,

---

**10.** As noted by the Supreme Court in *Bishop v. Wood*, 426 U.S. 341, 349, 96 S.Ct. 2074, 2079–2080, 48 L.Ed.2d 684 (1975) "[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies."

**11.** As the Court recently expressed in *Connick v. Myers*, —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), "the courts must reach the

most appropriate possible balance of the competing interests." *Id.* —— U.S. at ——, 103 S.Ct. at 1691, 75 L.Ed.2d at 722. Furthermore, this inquiry is treated as a legal determination which appellate courts are qualified to make. *Id.* —— U.S. at ——, 103 S.Ct. at 1690 n. 7 at 720, fn. 7 ("The inquiry into the protected status of speech is one of law not fact."). *See also Bickel v. Burkhart*, 632 F.2d 1251, 1256 (5th

we are to consider both the nature of the employment relationship and the nature of the speech activity involved. *Pickering v. Board of Education,* 391 U.S. 563, 569–73, 88 S.Ct. 1731, 1735–1737, 20 L.Ed.2d 811. With this in mind, we are convinced that the evidence in this case tilts the balance so heavily in favor of the Patrol's interest that Hughes' first amendment claim borders on the frivolous.

B. *The Patrol's Substantial Interest in Maintaining Morale v. Hughes' Dissension Causing Speech-Related Activity*

■ More so than the typical government employer, the Patrol has a significant government interest in regulating the speech activities of its officers in order "to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution." *Gasparinetti v. Kerr,* 568 F.2d 311, 315–16 (3rd Cir.1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1977); *also see* Note, *Free Speech and Impermissible Motive in Dismissal of Public Employees,* 89 Yale L.J. 376, 381, 381 n. 14 (1979). As the Supreme Court recognized in *Kelley v. Johnson,* 425 U.S. 238, 246–47, 96 S.Ct. 1440, 1445–1446, 47 L.Ed.2d 708 (1976), a police department has a substantial interest in developing "discipline, *esprit de corps,* and uniformity" within its ranks so as to insure the safety of persons and property. *See Waters v. Chaffin,* 684 F.2d 833, 839 (11th Cir.1982); *Kannisto v. City and County of San Francisco,*

541 F.2d 841, 843 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1978); *cf. Janusaitus v. Middlebury Volunteer Fire Department,* 607 F.2d 17, 26 (2nd Cir.1979) (fire department, like police department, has greater than normal government interest in maintaining morale and discipline).

■ Pursuant to this substantial interest, the Patrol, as a paramilitary force, should be accorded much wider latitude than the normal government employer in dealing with dissension within its ranks. *Wilson v. Taylor,* 658 F.2d 1021, 1027 (5th Cir.1981); *Gasparinetti,* 568 F.2d 311, 321–22 (3rd Cir.1977) (Rosenn, J., concurring in part and dissenting in part); *cf. Chappel v. Wallace,* —— U.S. ——, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983).[12] This requires judicial deference on two levels in this case. First, the Patrol's determination that an officer's speech-related conduct has contributed to dissension within the ranks is entitled to considerable deference. *Kannisto,* 541 F.2d at 844, *citing Kelley,* 425 U.S. at 246, 96 S.Ct. at 1445. Second, the Patrol's discretionary decision to reassign or discipline an officer whose speech-related conduct has contributed to dissension is similarly entitled to considerable deference. *Waters,* 684 F.2d at 839. As the Supreme Court has recently expressed in *Connick v. Meyers,* —— U.S. ——, ——, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708, 723 (1983), "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree

Cir.1980); *Tygrett v. Barry,* 627 F.2d 1279, 1287 (D.C.Cir.1980).

12. In *Chappel v. Wallace,* the Supreme Court recently articulated the very limited role the judicial branch has in reviewing military decisions that have an effect on soldier's constitutional rights. In unanimously holding that military personnel may not maintain suits to recover damages for alleged constitutional rights, the court stated:

... The special nature of military life, the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel, would be undermined by a judicially created remedy exposing officers to personal liability at the

hands of those they are charged to command. Here, ... we must be "concern[ed] with the disruption of '[t]he peculiar and special relationship of the soldier to his superiors' that might result if the soldier were allowed to hale his superior into court." *Id.* —— U.S. at ——, ——, 103 S.Ct. at 2367. (Citations omitted.)

While the military is distinguishable from the Patrol, we believe the same factors necessitating judicial deference to military decision—the compelling need for decisive action, discipline and harmony in the ranks—counsel in favor of according deference to the Patrol's decision here.

of deference to the employer's judgment is appropriate." [13]

■ Despite the district court's failure to so find, the evidence in the record clearly shows that there was a substantial morale problem in Troop "G" due to a personality dispute between Lt. Elmore and Hughes. Superintendent Whitmer, the ultimate transferring authority, Major Hoffman, whom the Superintendent ultimately relied upon in making the transfer decision, and Captain McKee all testified that an intense personality conflict existed between Elmore and Hughes. Major Hoffman, who conducted interviews with a number of Troop "G" patrolmen, including Elmore and Hughes, concluded that because of this conflict, Hughes and Elmore had lost their effectiveness and were disrupting the effectiveness of the entire troop. Major Hoffman determined that the major source of the friction between Hughes and Elmore was Hughes' various investigations and allegations regarding Elmore's son's drug-related activities. Hughes had also apparently become involved in a problem between the Elmore family and the parents of a 16-year-old girl who had been dating Elmore's son. Elmore reciprocated by conducting his own investigation of Hughes and by indicating his intention to file a defamation of character suit against Hughes. During their interviews with Hoffman, both Hughes and Elmore expressed their personal dislike for each other.[14]

While this battle between Hughes and Elmore was raging, several patrol officers speculated that either Hughes or Elmore would be transferred, depending on the relative weight the Superintendent would accord to Elmore's and Hughes' political connections. Several officers expressed the view that Major Hoffman could not "win" no matter what suggestion he made to resolve the dispute. Hoffman also found that many of the officers had taken sides in the dispute. Some officers expressed negative feelings about Elmore because of his son's possible involvement in drugs, and others disapproved of Elmore's retaliatory investigation of Hughes. On the other hand, some officers were critical of Hughes' obsession with Elmore's family affairs. Officers were also critical of various actions Hughes had taken in the past, wholly apart from his investigation of Elmore's son. Specifically, Hughes was criticized for: (1) filing baseless written reports criticizing Troop "G" radio operators for dereliction of duty; [15] (2) spending too much time patrolling the Mountain View area so that he could associate with his wealthy industrialist friend; and (3) reporting to a local school board that two teachers were engaged in a "compromising assignation."

Based on the foregoing evidence, we believe the Superintendent reasonably concluded that both Hughes and Elmore contributed to the morale problem in Troop "G," leading the Superintendent to exercise his statutory discretion and reassign both officers to other troops. Our review of this highly discretionary transfer decision is con-

---

13. The dissent urges that this court should not accord any deference to the Patrol's determination as to the source of and remedy to dissension within its ranks. However, the dissent offers no cases directly supporting this questionable proposition. The dissent does point to cases saying we should view the government employer's self serving, after the fact justifications with studied scepticism. However, here there was nothing "after the fact" or pretextual about the justification for the transfer.

14. The dissent's suggestion that the dissension in Troop G occurred only after Elmore's visit to Superintendent Whitmer in early October is a distortion of the record. According· to the troopers interviewed by Hoffman, the dissension had existed for some time prior to the Hoffman report to Superintendent Whitmer in early October. It was only after receiving Hoffman's report in early October that Superintendent Whitmer first *learned* about the gravity of the problem. It is absurd to suggest that because Whitmer and Hoffman first *learned* about the serious nature of the problem in early October the dissension problem could not have *arisen* at some earlier time.

15. As the dissent points out, Hughes testified that one of these reports was entirely justified. Other troopers apparently disagreed. The trial court did not make any finding on whether the reports were well-founded or baseless.

stitutionally limited to the extent that it was traceable, either directly or indirectly, to Hughes' speech-related activities. *Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 283–85, 97 S.Ct. 568, 574–575, 50 L.Ed.2d 471 (1977); *See Bowen v. Watkins,* 669 F.2d 979, 985–86 (5th Cir. 1982). In this case, although Hughes' transfer was directly traceable to dissension within Troop "G," it was at least indirectly traceable to Hughes' various speech-related accusations and investigations regarding Elmore's son, and to a lesser extent his reports criticizing fellow officers, his report to the school board regarding two teachers, and his alleged on-the-job association with a wealthy industrialist. Even so, applying the factors enunciated in *Pickering,* 391 U.S. 570–73, 88 S.Ct. at 1735–1737, the Patrol has clearly demonstrated that these speech-related activities had the ultimate effect of (1) interfering with the Patrol's maintenance of harmony among its employees; (2) impeding Hughes' proper performance of his duties; and (3) interfering with the regular operation of the troop. We therefore conclude that the Patrol has clearly demonstrated its significant interest in dealing with the disruptive effects of Hughes' speech-related conduct.

■■■■ Furthermore, the transfer decision here was an entirely appropriate and reasonable means of achieving the Patrol's significant interest in maintaining discipline and harmony. Admittedly, a transfer traceable to speech-related activity is properly the subject of first amendment challenge, even though the transfer resulted in no loss of pay, seniority, or other benefit. *Egger v. Phillips,* 669 F.2d 497, 501 (7th Cir.1982), *McGill v. Board of Education of Perkins Elementary School,* 602 F.2d 774, 780 (7th Cir.1979). However, because the officers in Troop "G" had divided their loyalties between Hughes and Elmore, the Superintendent was required to devise a solution that would appear completely impartial and, at the same time, improve the morale and efficiency of the troop. With this in mind, the Superintendent viewed a transfer of both Elmore and Hughes as an effective, nondiscriminatory and nonpunitive [16] solution to the morale problem. To foreclose that solution in this case would entail a serious encroachment on the Superintendent's discretionary decision to reassign personnel in the interest of promoting public safety. We therefore follow the dicta in *Waters,* 684 F.2d 839, that the "reasonable possibility of adverse harm will generally be enough to invoke the full force of judicial solicitude for a police department's internal morale and discipline." *See also Connick v. Myers,* ── U.S. at ──, 103 S.Ct. at 1692, 75 L.Ed.2d at 723.

■■■■ We do not view Hughes' various dissension causing, speech-related activities as being of such public and social importance as to override the Patrol's substantial interest in maintaining troop morale. In *Connick v. Myers,* ── U.S. at ── 103 S.Ct. at 1690, 75 L.Ed.2d at 720, the Supreme Court held that where an employee's speech does not involve a matter of public concern (considering the context, form and content of the speech), "a federal court is not the appropriate forum in which to review the personnel decision taken by a public agency allegedly in reaction to the employee's [speech activity]." However, even if the speech activity may be fairly characterized as involving a matter of public concern, the state's burden in justifying its personnel decision depends upon the nature of the employee's expression. *Id.* ── U.S. at ──, 103 S.Ct. at 1691–1692, 75 L.Ed.2d at 722. Particularly relevant in this inquiry is the manner, time, and place in which the speech-related activity occurred. *Id.* ── U.S. at ──, 103 S.Ct. at 1692, 75 L.Ed.2d at 723. As the court noted in *Givhan v. Western Line Consolidated School District,*

---

**16.** Hughes was offered moving expenses and was provided the same job status and pay in Troop "C" as he had enjoyed in Troop "G." If the transfer had been punitive, Hughes could have been denied moving expenses. The view shared by a few rural troopers that Troop "C" was an undesirable assignment is not particularly probative as to whether the transfer was punitive. Major Hoffman, who recommended the transfer to Troop "C," testified that the decision was made based upon the personnel needs of other troop commanders.

439 U.S. 410, 414 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979), "an employing agency's institutional efficiency may be threatened not only by the context of the employee's message but also by the manner, time, and place in which it is delivered." *Accord, Nathanson v. United States,* 702 F.2d 162, 165–66 (8th Cir.1983) (where manner in which employee expressed his view hindered his ability to perform his job and threatened the overall operations of his employer, termination of employee did not violate his first amendment rights).

The most significant of Hughes' dissension causing, speech-related activity concerned his investigation and accusation regarding Elmore's son. While Hughes' investigation and accusation of illegal drug activities may be fairly characterized as involving a matter of public concern, it was the highly antagonistic manner in which he conducted his investigation and expressed his views regarding this investigation that forced the Superintendent to make the transfer decision. Troop "G" officers, referring to Hughes' accusations regarding Elmore and his son, concluded that Hughes had become too personally involved in Elmore's family affairs, hindering his own job performance and disrupting troop morale. However, far from taking sides with Elmore in this dispute, the Superintendent decided to transfer both officers to other troops for the good of troop morale. Thus, we are not dealing here with a heavy handed measure, clearly designed to punish or chill the content of expressions on matters of public concern. Rather, the Patrol's remedy here was narrowly tailored to deal with the disruptive effects of Hughes' antagonistic manner of exercising his first amendment rights.

■ Furthermore, as has been recognized by other courts, where an officer's speech-related activity has the effect of materially disrupting his working environment, such activity ·is not immunized by constitutional guarantees of freedom of speech. *Kannisto,* 641 F.2d at 844; *Santos v. Miami Region, United States Customs Service,* 642 F.2d 21, 25 (1st Cir.1981); *Sprague v. Fitzpatrick,* 546 F.2d 560, 564 (3d Cir.1976), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255. In *Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708, the Supreme Court indicated that a government employer can take action against an employee for potentially disruptive expression even though the government employer cannot "clearly demonstrate" that the expression "substantially interfered" with the institutional efficiency and morale. *Id.* —— U.S. at ——, 103 S.Ct. at 1691, 75 L.Ed.2d at 722.[17] The court concluded that where an employee's speech merely touched, rather than "substantially involved" matters of public concern[18] and where "close working relationships were essential to fulfilling public responsibilities," an employer can take action against the employee for expression "which [the employer] *reasonably believed* would disrupt the office, undermine his authority, and destroy close working relationships." *Id.* —— U.S. at ——, ——, 103 S.Ct. at 1692–1693, 75 L.Ed.2d at 723, 724. (Emphasis added.) As the Court explained:

> When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employ-

---

**17.** In *Tinker v. Des Moines School Dist.,* 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1968) the Supreme Court first applied the material disruption standard in the context of the academic environment. The Court noted that where a student's expression "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school," such expression was not protected by the first amendment. In applying this standard, the Court emphasized the deeply rooted tradition of encouraging the free and robust exchange of ideas in the academic setting. *Id.* at 512, 89 S.Ct. at 739–740. In *Pickering,* the

Supreme Court gave no indication whether a lesser showing of disruption or interference would be necessary to curtail the speech-related activities of public employees outside the context of the academic environment.

**18.** In *Connick,* the employee's expression entailed a questionnaire *to other employees* basically criticizing her supervisor's internal office policies, with only one question addressing whether the employees felt pressured to work in particular political campaigns.

er's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action. *Id.* —— U.S. at ——, 103 S.Ct. at 1692, 75 L.Ed.2d at 723.

■ Fortunately, whether this lesser showing of interference with governmental operations applies here is of academic interest because even assuming Hughes' speech "substantially involved" matters of public concern, the Patrol has met the stronger showing of "clearly demonstrating" that Hughes' expression "materially and substantially interfered" with the maintenance of discipline and harmony in Troop "G."

## C. *Hughes' Purported Whistle-Blowing Activities*

■ We recognize that the first amendment balancing test cannot be controlled by a finding that disruption has occurred where such disruption occurs because a public employee blows the whistle on the corruption of public officials. *Porter v. Califano,* 592 F.2d 770, 773–74 (5th Cir.1979); *Atcherson v. Siebenmann,* 605 F.2d 1058, 1063 (8th Cir.1979); *Janusaitis v. Middlebury Volunteer Fire Dept.,* 607 F.2d 17, 25 (2nd Cir.1979). As the Fifth Circuit has aptly stated "it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because their speech somewhat disrupted the office." *Porter,* 592 F.2d 773–74. Thus, an employee's first amendment interest is entitled to more weight where he is acting as a whistle-blower exposing government corruption. *Brockell v. Norton,* 688 F.2d 588, 593 (8th Cir.1982); *Foster v. Ripley,* 645 F.2d 1142, 1149 (D.C.Cir.1981). However, we do not view this case as a "whistle-blower" type case because Hughes' transfer was wholly unrelated to his purported corruption exposing activities.

At trial, Hughes testified that he believed Captain McKee was involved in a ticket-fixing incident some five or six years ago, but that he had no personal knowledge regarding the incident. Captain McKee denied having ever fixed any traffic ticket. There was no other testimony regarding this alleged occurrence. Hughes also testified that Captain McKee and Lt. Hickman were involved in a cover-up of a prisoner abuse incident. Though having no personal knowledge of the incident, Hughes referred to a report written by Trooper Mitchell and Sergeant Zorsch indicating that an officer had allegedly handcuffed and struck an arrestee. Captain McKee allegedly concealed this report and, after interviewing the two officers purportedly involved in the beating, collaborated with Lt. Hickman in writing another report discrediting the arrestee's allegations. Sergeant Zorsch testified that while he believed some of the arrestee's allegations were true, Captain McKee could have reasonably reached a different conclusion and was not trying to cover up something. Lt. Mitchell was unavailable to testify regarding the incident and Captain McKee and Lt. Hickman firmly denied any cover-up of the incident.

■ Hughes claims that his transfer was made in retaliation for his investigations and allegations regarding the ticket-fixing incident and the cover-up of the police brutality incident. Were this true, a different case would be presented. *See Atcherson,* 605 F.2d 1058. However, the evidence clearly shows neither Superintendent Whitmer nor Major Hoffman ever knew about, let alone disapproved of or attempted to interfere with, Hughes' investigations and expressions regarding the alleged ticket-fixing or police brutality. Furthermore, there is no evidence that the dissension that existed within Troop "G" was even remotely related to Hughes' investigations and expressions regarding these alleged improprieties. Superintendent Whitmer testified that he was completely unaware of Hughes' allegations of improprieties until Hughes testified about them at trial. Major Hoffman testified that the alleged improprieties were never mentioned by any of the troopers he interviewed, not even by Hughes. Hughes testified that de-

spite having the opportunity, he never told Hoffman or anybody else within the Patrol's command staff about his investigations concerning these alleged improprieties; nor did Hughes ever file any report regarding these incidents. Under the circumstances, we do not believe Hughes has shown or indeed can ever show that his reputed whistle-blowing investigations were what caused his transfer. *See Mount Healthy City School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

Finally, there is no support for Hughes' claim that he was transferred because the Patrol disapproved of or sought to interfere with his legitimate surveillance of the Mountain View Airport for possible drug importation. Quite to the contrary, Hughes admitted that Captain McKee actively encouraged Hughes' surveillance, even though a state representative had filed a complaint regarding the surveillance. Hughes also testified that Captain McKee placed a call to Jefferson City requesting surveillance equipment for Hughes. Later, when the surveillance equipment was not forthcoming, Hughes never asked Captain McKee to renew the request. We can find no indication that the Patrol ever interfered with Hughes' surveillance,[19] even though Hughes had spent an entire year on this project without ever finding any tangible evidence of impropriety.

Furthermore, Superintendent Whitmer testified that the transfer decision had nothing to do with the state representative's criticism of the airport surveillance. This testimony was corroborated by Major Hoffman's internal report and recommendation regarding the morale problem in Troop "G."

D. *Hughes' "Political" Association with Claud Trieman*

 Despite the dissent's suggestion, there is no support for Hughes' claim that his off-duty first amendment protected association with Claud Trieman was a "motivating factor" behind the transfer decision, let alone the "but for" cause of the transfer decision. *See Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. The record does show that other troopers complained that Hughes' on-the-job association with Trieman was interfering with the performance of his duties. Troopers also expressed the belief that Hughes was currying favors in order to elicit Trieman's support in his bid for the Superintendent's position. However, even the dissent is not so bold as to suggest Hughes' associational rights permit him to associate with whomever he likes and whenever he likes while he is on duty.[20] And, even assuming this criticism of Hughes' on-duty association with Trieman is interpreted as an implied criticism of Hughes' legitimate off-duty association with Trieman, we believe the record clearly shows that the transfer decision would have been made regardless of such association. The primary source of the dissension in Troop "G" concerned Hughes' and Elmore's battle over Elmore's son's possible involvement in drug-related activity. Hughes' association with Trieman was peripheral to this dissension and, hence, was not at the center of the Superintendent's effort to remedy the dissension by transferring both Hughes and Elmore out of Troop "G."

---

**19.** In an internal memorandum, Lt. Hickman expressed his opinion that it was not necessary for Hughes to spend all of his time patrolling the Mountain View area. We do not interpret this suggestion as either disapproving of or interfering with Hughes' surveillance of the Mountain View Airport. Instead, Lt. Hickman's suggestion was made because an officer was already stationed in the Mountain View area.

**20.** The dissent points to the Disciplinary Report of Captain McKee as evidence that officers were critical of Hughes "off-duty" association with Trieman. However, far from supporting the dissent's position, the Report actually reveals that McKee, like other troopers in "Troop G," believed that Hughes' own personal political ambitions were determining where he would decide to spend his time while on duty. And while the trial testimony does contain references to Hughes' political association with Trieman, nothing about those references can be interpreted as a criticism of Hughes' legitimate off-duty association with Trieman.

### E. *Conclusion*

We therefore conclude that it is unnecessary and would be a waste of judicial resources to remand this case to the district court for a determination of whether the transfer was designed to discipline Hughes for his legitimate investigation of improprieties in Troop "G," his surveillance of the Mountain View Airport, or his association with Claud Trieman.

The dissent, choosing to rely entirely on Hughes' uncorroborated claims that he was disciplined for his legitimate whistle-blowing activities, concludes that we should not accord any deference to the Patrol's determination to transfer Hughes because of his dissension causing activities. The dissent cites no case support for this novel proposition.[21] Indeed, as we have mentioned above, the case authority clearly indicates that we should accord considerable deference to the Patrol's determination that an employee's activities have disrupted efficiency and morale. *See Connick v. Myers,* —— U.S. at ——, 103 S.Ct. at 1692, 75 L.Ed.2d at 723; *Kannisto,* 541 F.2d at 844, *citing Kelley,* 425 U.S. at 246, 96 S.Ct. at 1445; *Waters,* 684 F.2d at 839. In any event, despite the dissent's suggestion, the district court did not find and the record clearly does not suggest that Hughes was transferred to punish him for his legitimate whistle-blowing investigations and his legitimate off-duty political associations.

The dissent also suggests that the district court's findings are contrary to our conclusion that the transfer was designed to resolve dissension within Troop "G." The district court made no finding concerning whether the transfer decision was designed to resolve a dissension problem within Troop "G"; nor did the district court discredit Superintendent Whitmer's and Major Hoffman's testimony regarding the gravity or source of the dissension problem within Troop "G." The dissent however points out that the district court found that Hughes' transfer was disciplinary in nature. This district court finding was the basis for its conclusion that Hughes was entitled to a "name-clearing" hearing. Certainly a finding that the transfer was sufficiently disciplinary in nature so as to trigger "name-clearing" hearing is not inconsistent with our conclusion that the transfer was also designed to remedy a dissension problem. Indeed, as we have indicated above, the transfer here may be characterized as disciplinary in the sense that it was indirectly traceable to Hughes' dissension causing activities (as distinguished from his legitimate whistle-blowing activities). However, having carefully weighed the substantial interests of the Patrol and Hughes' speech interest, we have concluded that the transfer decision here was an entirely reasonable measure and not violative of Hughes' first amendment rights.

In striking the *Pickering* balance in this case, we are compelled to emphasize that free speech claims are not to be considered in a vacuum but must be viewed in light of the circumstances and in the context of all relevant conditions existing at the time of the asserted free speech activities. Nor should free speech rights be utilized to provide immunity to other actions that merit condemnation, discipline or sanctions assessed in the public interest. *See Mt. Healthy,* 429 U.S. at 285–86, 97 S.Ct. at 575–576. The public weal demands that public officials carry out their duties and responsibilities so that their offices are run efficiently, harmoniously and responsive to the administration of the public service they are employed to perform. In particular, paramilitary units have a need to uphold morale, an *esprit de corps* and an affirmative public image.

Judgment reversed.

McMILLIAN, Circuit Judge, dissenting.

I agree fully with the majority opinion's due process analysis. Accordingly, I concur in Part II of the majority opinion. But, because I substantially disagree with the majority's reading of the record and application of the law on the first amendment issue, I must respectfully dissent. The

---

**21.** *See supra,* note 13.

facts presented in the majority opinion represent only one side of the story. The following is Hughes' version of the key incidents leading up to his transfer.

## I. THE "FACTS"

In the months preceding his transfer, Hughes was involved in several investigations and activities that raised the ire of his supervisors, particularly Lt. Elmore. One investigation concerned Lt. Elmore's son's alleged drug dealing. During this investigation, Hughes and his partner, Trooper Tuschhoff, suspected that Lt. Elmore was leaking information to his son and his son's cohorts. To verify their suspicions, Tuschhoff gave Lt. Elmore fictitious information about a planned raid on the residence of a group of suspected drug dealers with whom Elmore's son was associated. The next day these suspects moved out of Willow Springs.

Another investigation involved the Mountain View Airport. Hughes had received information that suspicious late-night flights in and out of the airport might be related to drug smuggling. In response to this information, Hughes asked Capt. McKee to obtain special night surveillance equipment. Capt. McKee, with Hughes present, placed a call to Capt. Maddox who was in charge of the equipment. Capt. Maddox informed Capt. McKee that he had surveillance equipment that would be available. Capt. McKee then told Hughes that he would get the equipment and that Hughes should continue the investigation. But Capt. McKee also cautioned Hughes that he should be very careful in conducting his investigation because several prominent citizens housed their aircraft at Mountain View. The surveillance equipment never came, however, despite the fact that Hughes renewed his request on at least two occasions. Tr. at 84. In any event it did not matter, because soon after Hughes disclosed this information to his superiors, the suspicious flights suddenly stopped. It was also revealed that a state legislator who kept his plane at Mountain View had visited Supt. Whitmer and complained at length about Hughes' investigation of the Mountain View Airport. Although Supt. Whitmer told the state legislator that he did not want the state legislator to tell him how to run the Patrol, Supt. Whitmer did assure the state legislator that he "would make an inquiry into the matter" and would "resolve the problem." Tr. at 31.

Hughes also was involved in an incident which he alleges led to a cover-up of a Troop "G" dispatcher's dereliction of duty. The majority refers to this as a "baseless" accusation. *Supra* at 1412, 1420. One evening Hughes was working the desk at headquarters because of a shortage of desk personnel. The only other person in the office was the radio dispatcher. Hughes received a call reporting a serious auto accident in the area. Hughes, being the closest trooper, responded to the call and left the dispatcher to cover the desk. At the scene, Hughes discovered that there had been a head-on collision between two cars at the crest of a hill. The area was very dark. One car was blocking the road, while the other car was in a ditch with a person pinned inside of it. Gasoline was pouring from one car's ruptured gasoline tank toward one of the injured occupants of the cars. Another victim was soaked in blood and walking the roadway in a daze. In short, Hughes had a highly dangerous situation to cope with all by himself. He radioed the dispatcher for a fire truck, an ambulance, and a wrecker. The radio dispatcher replied angrily that he was busy on the phone. The dispatcher gave no further answer to Hughes' request and did not dispatch any assistance to Hughes. Hughes explained that the reason the dispatcher was angry was because the dispatcher did not like to be left alone to answer both the phones and the radio. Eventually assistance did arrive when the City Police of Willow Springs dispatched the requested equipment after they overheard Hughes' pleadings for help on the radio. Hughes reported this incident to his Zone Sergeant. Hughes' Zone Sergeant told him not to tell the Captain, but Hughes did anyway. The Captain told Hughes to write a report, which Hughes did. The Captain then took

Hughes' report to the dispatcher and told the dispatcher to rewrite the report. The dispatcher rewrote the report exonerating himself and blaming Hughes for the incident. This revision became the official report. The Captain then told Hughes that he was not to report this incident to Patrol General Headquarters in Jefferson City because the Captain did not want his superiors in Jefferson City to think he could not run his Troop. Hughes also testified that Lt. Hickman told him to "play it cool. We've just got a couple more years and we'll all retire and get out of your hair." Tr. at 91–94.

Yet another investigation concerned an alleged cover-up of "police brutality" occurring at Troop "G" headquarters. According to Hughes, two troopers carried out a personal vendetta against a person by arresting him and beating him while he was handcuffed and in the troopers' custody. An internal report of the incident was prepared by Sgt. Zorsch. Sgt. Zorsch's report revealed that the allegation was in part true and that one of the accused troopers even admitted to beating the arrestee. Tr. at 150. Capt. McKee, however, rejected Sgt. Zorsch's report and ordered him to submit an abbreviated version which would state that the arrestee received his injuries when he accidentally fell down. Sgt. Zorsch was also ordered to destroy the original report and to submit the abbreviated version to headquarters as the official report. Sgt. Zorsch followed Capt. McKee's orders even though he was of the opinion that the original report was a full, fair, and accurate recount of the incident. Tr. at 149. Hughes retrieved the report from the office waste paper because he believed Capt. McKee and Lt. Hickman were attempting to cover up the incident due to a threatened civil rights lawsuit. Hughes felt that such a cover-up violated the law and was an extreme breach of a law enforcement officer's duty. Because Hughes did not trust his immediate superiors and because Supt. Whitmer was unavailable to Hughes, Hughes took this and other information to a friend named Claud Trieman who was a member of the Governor's Crime Commission. As the majority notes, Hughes did so in the hope that Trieman, as a member of the Crime Commission, could intercede with the higher echelon at Patrol General Headquarters to initiate some reform within Troop "G." Tr. at 89–90.

Hughes had also become involved in politics and had developed a close political association with a "local industrialist" named Claud Trieman—the same Claud Trieman who was a member of the Governor's Crime Commission. With the help of Trieman and other local politicians, Hughes sought to become the Superintendent of the Patrol. Hughes eventually lost the nomination to Supt. Whitmer. But Hughes' initial foray into politics incensed his superiors. According to Hughes, Lt. Hickman, Lt. Elmore and Capt. McKee resented Hughes because his political activity was "not a normal thing for one in [Hughes'] position as a lowly trooper." Tr. at 68. Hughes also testified that Capt. McKee told him he better not associate with Trieman because Trieman had begun to get involved in politics. Additionally, the disciplinary reports prepared by Capt. McKee and Lt. Hickman list Hughes' off-duty political association with Trieman as one of the reasons why Hughes should be disciplined. See Capt. McKee's endorsement of the report on "Disciplinary Action—Trooper W.E. Hughes," Exhibit 17, at 3, ¶ 2 (hereinafter referred to as Disciplinary Report).

The chronology of the events in this case is also important. The senior staff at Patrol Headquarters in Jefferson City first received information about trouble in Troop "G" in August of 1981. At that time Capt. McKee told Maj. Hoffman about a "problem" within the Troop. The "problem" was that Lt. Elmore's son had been implicated in selling illegal drugs. Tr. at 202–03. On September 30, Maj. Hoffman received information that the state legislator who housed his airplane at Mountain View Airport had complained to the Captain of Troop "I" about Hughes' Mountain View investigation. At about this same time, the state legislator also complained bitterly to Supt. Whitmer about Hughes' investigation.

Tr. at 30. It was at this meeting with the state legislator that Supt. Whitmer promised that he would "resolve the problem." Shortly thereafter, Lt. Elmore met with Supt. Whitmer to complain about Hughes' investigation and Hughes' political association with Trieman. Tr. at 28–29. During Lt. Elmore's meeting with Supt. Whitmer, Supt. Whitmer asked Elmore for his advice on how the Superintendent should proceed on this matter. Elmore suggested that Hughes be transferred to Troop "C." Troop "C" is considered by many rural troopers to be the "Siberia" of the Patrol. Tr. at 129, 139, 156, 172. In fact, at least one trooper from Troop "G" was transferred to Troop "C" as punishment for being intoxicated while on duty. Tr. at 54. After Lt. Elmore made this suggestion, the meeting ended and Supt. Whitmer told Lt. Elmore that Maj. Hoffman would "resolve" the problem. Tr. at 29. Supt. Whitmer, however, denied that he made a decision to transfer Hughes at that time. Tr. 28–30. Yet there was testimony that according to Lt. Elmore, Supt. Whitmer asked Lt. Elmore to which troop would Hughes least like to be assigned. Lt. Elmore's reply was Troop "C" and, reportedly, Whitmer's response was "that's where I'll send him." Tr. at 139.

Up until this point, around the first of October, there was *no dissension* within Troop "G." Tr. at 143–44, 145–46, 158. When Lt. Elmore returned to Troop "G" from Jefferson City, around October 3 or 4, he told several troopers that he was having Hughes transferred to Troop "C." It was only at this juncture that dissension began to brew in Troop "G" as troopers took sides over the rumored transfer of Hughes. Tr. at 143–44, 206. On October 7, Capt. McKee called Maj. Hoffman and told him of the growing dissension. At McKee's request, Maj. Hoffman came down to Troop "G" the next day in order to discuss the Troop's problems with some of its members during a regularly scheduled meeting. Maj. Hoffman interviewed several members and concluded that the troop was indeed split into two camps. Then, on October 10, Capt. McKee received a telephone call from Maj.

Hoffman asking if Capt. McKee would accept a Troop "C" trooper's transfer to Troop "G" in exchange for Hughes. Tr. at 295. Capt. McKee said he would agree. Yet, according to the testimony of Maj. Hoffman, the decision to transfer Hughes was not made until October 15 or 16.

After Lt. Elmore returned from Jefferson City he began to seek information from Troop members that would discredit Hughes. Tr. at 164–65. Elmore even hired someone to investigate Hughes. Meanwhile, Lt. Elmore prepared a report dated October 12 in which he recommended that Hughes be transferred because of his investigation of Elmore's son, because of Hughes' other "seemingly uncontrollable actions over the last few years" that discredited the Patrol, and because of "Hughes' close association with a local wealthy industrialist who is heavily involved in statewide politics." Disciplinary Report at 1. Lt. Hickman's endorsement, dated the same day, also recommended Hughes' transfer and reiterated the reasons given by Lt. Elmore. In turn, Capt. McKee endorsed the report on October 13 and concluded that because Hughes had "caused a great deal of turmoil in the Troop . . . with his controversial actions and political manuevering," he should be transferred "for the benefit of all concerned." *Id.* at 5, ¶ 10. The day after endorsing Lt. Elmore's report, Capt. McKee recommended that Lt. Elmore also be transferred. Supt. Whitmer placed the third and final endorsement on Lt. Elmore's report. Supt. Whitmer then ordered Hughes to be transferred to Troop "C," effective October 19, and Elmore to be transferred to Troop "D," another rural troop, effective November 1. Whitmer's endorsement, however, was dated October 27, 1981, eleven days *after* Hughes was told to report to Troop "C."

Maj. Hoffman met with Hughes on Friday, October 16, 1981, the day the decision to transfer Hughes was supposedly made. Hoffman ordered Hughes to report to Troop "C," some 200 miles away, that Monday, October 19 for permanent assignment. Hughes had heard rumors of his impending

transfer, and at this meeting he asked Maj. Hoffman, "How come a State Representative knows over a week ahead of time that I'm being moved." Hughes testified that Maj. Hoffman replied, "Well, I didn't tell. It wasn't me that told." Tr. at 52.

## II. THE RECORD EVIDENCE

From these highly disputed facts, the majority opinion makes two important factual findings: (1) the present record "clearly shows that the transfer was designed to resolve a substantial and debilitating morale problem in Troop 'G' ", and (2) Hughes' transfer was "wholly unrelated to his purported corruption exposing activities." *See supra* at 1417–1418, 1423. Based on these findings, the majority opinion concludes that the balance between the government's interest in efficiency and Hughes' first amendment interests "tilts . . . so heavily in favor of the Patrol's interest that Hughes' first amendment claim borders on the frivolous." *Supra* at 1418–1419. On the present record, I cannot agree.

It must first be emphasized that the district court below did not address Hughes' first amendment cause of action. Therefore, we have no pertinent findings of fact with which to review the first amendment issues raised by Hughes' complaint. The majority points out that the determination of whether conduct is protected by the first amendment is a question of law which appellate courts are qualified to answer without regard to a district court's findings of fact. *See supra* at 1418–1419 n. 11. While it may be true that balancing the government's interests against an employee's interests is a legal determination, it is a determination which must be rooted in historical fact. *See Waters v. Chaffin*, 684 F.2d 833, 837 n. 10 (11th Cir.1982); *Bickel v. Burkhart*, 632 F.2d 1251, 1255 n. 7 (5th

Cir.1980). The present record contains many disputed facts which can only be resolved on the basis of credibility. Thus, the procedural posture of this case is in many ways similar to that of cases which reach this court after the defendant has obtained summary judgment. In summary judgment cases, the appellate court will view the facts in the light most favorable to the non-moving party and will "give that party the benefit of all reasonable inferences to be drawn from the underlying facts." *EEOC v. Liberty Loan Corp.*, 584 F.2d 853, 857 (8th Cir.1978). Thus, in reviewing Hughes' first amendment claim, we should favor Hughes' version of the facts over the Patrol's version. If this is done, Hughes' first amendment claim is far from frivolous.

### A. *The Motivating Factor*

The majority opinion's first factual conclusion is that the only motivating factor in the Patrol's decision to transfer Hughes was the desire to resolve a debilitating morale problem in Troop "G." I cannot agree with this factual conclusion because it is contrary to the district court's findings of fact relating to the due process issue. Throughout the trial below, the Patrol took the position that Hughes was transferred merely to remedy a personality conflict between Hughes and Lt. Elmore, and not as punishment for Hughes' investigatory and political activities. The Patrol's witnesses also testified that Hughes was transferred to Troop "C" in particular simply to correct a troop imbalance within Troop "C." The whole thrust of the testimony presented by the Patrol was that Hughes' transfer was not a disciplinary measure. The majority opinion has adopted the Patrol's version of the facts without exception. But the district court, after listening to both sides' witnesses and studying their demeanor,[1]

---

1. It should be noted that at least two troopers testified they feared that there would be reprisals against them if they testified adversely to their superiors. *See, e.g.,* Tr. at 156–57, 160, 171, 173–74, 131. Whether this fear was more imagined than real is irrelevant. The fact remains that the troopers felt this fear when they testified. Only the district court, who saw and

heard the witnesses, can determine whether this fear affected the witnesses' testimony. This factor, which cannot be appreciated by reading a cold record, is an important element in determining the credibility of the testimony and, concomitantly, in deciding disputed questions of fact. This factor amplifies the need to

without exception *rejected* the Patrol's factual assertions. After a hearing on Hughes' motion for a preliminary injunction, the district court specifically found that Hughes' transfer was punitive and disciplinary.[2] This finding was echoed in the district court's decision on the merits. There, the district court held that Hughes "was not sent to Troop 'C' to remedy an imbalance in Troop 'C'" and that it felt "compelled by the weight of the evidence to conclude that the defendant ordered the transfer of the plaintiff for disciplinary reasons." *Hughes v. Whitmer*, 537 F.Supp. 93, 94, 97 (W.D.Mo.1982). These factual findings show that the district court believed Hughes and his witnesses and disbelieved the Patrol's witnesses. These findings therefore represent an implicit credibility finding against the Patrol's witnesses, including the defendant, and in favor of Hughes' witnesses. This credibility determination, made by the trier of fact who actually heard and saw the live testimony, should again cause this Court to read the record evidence in the light most favorable to Hughes' position. Instead, the majority opinion rejects the testimony of Hughes and his witnesses without comment in favor of a ratification of the Patrol's witnesses' testimony. Normally, we would at least scrutinize the district court's findings of fact under the clearly erroneous standard of review. *See infra* at 1434 n. 6.

The record evidence demonstrates that the district court's findings are not clearly erroneous. Indeed, there is substantial evidence to support the conclusion that Hughes was transferred to punish him. But punish him for what? Hughes' answer is that he was being punished for investigating possible wrongdoing by his superiors, for reporting his findings to a member of the Governor's Crime Commission, and for his political associations. Informative in this regard is Lt. Hickman's response to the district court's direct question, "Why did

you recommend the transfer of Hughes and not recommend the transfer of Elmore?" Lt. Hickman's answer to this question was: "When is it going to stop where a trooper can take on a lieutenant? And when is a trooper going to be permitted to investigate a lieutenant and his son?" Tr. at 368. Equally illuminating is the Patrol's counsel's closing colloquy with the district judge. Counsel, in arguing that the Patrol did not want Hughes back in Troop "G," said "What will happen, the Patrol feels, is if Trooper Hughes is returned, his faction will begin to continue the events and items that they were involved in." Tr. at 391. According to Hughes' Disciplinary Report, those "events and items" included Hughes' legitimate investigation of possible illegal drug dealing by Elmore's son, Hughes' Mountain View Airport investigation which so upset a state legislator, and Hughes' political association with "a wealthy industrialist." The Disciplinary Report itself lists these items as the principal reasons why Hughes should be transferred and, implicitly, why Elmore should not be transferred. Also, the record contains testimony presented to prove that Supt. Whitmer decided to transfer Hughes, and Hughes alone, in response to the state legislator's and Lt. Elmore's complaints about Hughes' investigations and political associations. Although far from convincing proof, this testimony does support the reasonable inference that these complaints were a substantial motivating factor in Supt. Whitmer's decision. Two other incidents which occurred after Hughes' transfer drive the point home. In one incident a trooper was "reminded" by Capt. McKee that the Patrol had a shortage of personnel across the state and if the trooper did not "cooperate" with the Captain, then the Captain "would not be expected to cooperate" with the trooper "in reference to these personnel changes." Tr. at 157. In another separate incident, the state legislator that was mentioned ear-

---

remand this case so that the trier of fact can resolve the factual disputes.

**2.** This finding of fact was related to Hughes' due process count. The district court did not

reach the merits of Hughes' first amendment claim in granting the preliminary injunction against the Patrol.

lier told a trooper, "I've got one trooper moved and I'll get you moved if you fool with me." Tr. at 320–21. There was substantial testimony from Troop "G" troopers that they now fear to speak out against their commanding officers and are also afraid to investigate or arrest certain people. *See, e.g.,* Tr. at 156–57, 160, 171, 173–74, 177.

The second reason why I cannot agree that dissension was the motivating factor for Hughes' transfer is that the record raises a substantial question as to which came first. Did the dissension cause the Patrol to transfer Hughes or, rather, did the Patrol's decision to transfer Hughes cause the dissension? The present record does not make the former more plausible than the latter, and, if one views the facts in the light most favorable to Hughes, the latter reflects the more probable sequence of events. Because first amendment rights are held in such high esteem, courts must conduct an "individualized and searching" review of the facts to determine exactly why the government took the action that it did. For the same reason, courts must view the government's self-serving after-the-fact justifications with studied skepticism. *See Peacock v. Duval,* 694 F.2d 644, 648 (9th Cir.1982); *Tygrett v. Barry,* 627 F.2d 1279, 1283 (D.C. Cir.1980). *See also* Finck, *Nonpartisan Speech in the Police Department: The Aftermath of Pickering,* 7 Hastings Const. L.Q. 1001, 1017 (1980).[3] This is especially true in cases, such as this one, in which the trier of fact has made a general credibility finding against the government's witnesses.

At least two troopers testified that there was no dissension and no debilitating morale problem in Troop "G" until *after* Lt. Elmore began to spread the word that Hughes was to be transferred in retaliation for his investigations and political associa-

tions. *See, e.g.,* Tr. at 143–44, 206, 336. Elmore made these statements around October 3. Maj. Hoffman did not conduct his investigation until October 8. Of course Maj. Hoffman observed dissension, but the dissension he saw was in all likelihood generated by Lt. Elmore's disclosure that the Patrol had decided to transfer Hughes. In fact morale in Troop "G" has continued to decline, rather than improve, after Hughes' and Elmore's transfers. Several troopers view Hughes' transfer as a signal that diversity of opinion will not be tolerated. At least two troopers actually testified that they fear reprisals from their superiors if they speak out or testify against their superiors or if they arrest the wrong people. As mentioned above, there is some testimony that supports the inference that Supt. Whitmer decided to transfer Hughes in the first few days of October in response to complaints from the state legislator and Lt. Elmore concerning Hughes' activities. *This was before the dissension erupted in Troop "G."* The state legislator had even bragged that it was he who had Hughes transferred and he tried to use this fact to procure deference from another trooper.

It must be noted also that the paperwork that rationalized the decision to transfer Hughes substantially lagged behind the actual decision to transfer Hughes. For example, Supt. Whitmer did not endorse the transfer recommendations until October 27, eleven days after Hughes was transferred. Hughes' § 1983 suit was filed two weeks after the transfer, but Maj. Hoffman knew that Hughes was represented by counsel as of the day Hughes was told to report to Troop "C." According to Hughes, the official rationalization for his transfer, like Sgt. Zorsch's report on the injured arrestee, may have been shaped by the threat of litigation. Although probative, I agree with the majority that this evidence is far from con-

**3.** The majority comments that the dissenting opinion offers no case support for the "questionable proposition" that a court should not defer to the judgment of a litigant when confronted with first amendment issues. *See supra* Majority Opinion at n. 13. I offer the above authorities, and those cited *infra* at note 6, for support. *See also Connick v. Myers,* ——

U.S. ——, 103 S.Ct. 1684, 1692 n. 10, 75 L.Ed.2d 708 (1983) (collecting cases which hold that even after the trier-of-fact determines the historical facts, the appellate court must exercise its own independent judgment about the constitutional significance of those facts when first amendment rights are at stake).

clusive proof. The majority correctly notes that it would be absurd to say that dissension *could* not have arisen before the decision to transfer Hughes was made. Hughes, however, offered the testimony of his fellow troopers that indeed no dissension did exist up until Lt. Elmore returned from Jefferson City with the news that Hughes was to be transferred. The evidence is simply conflicting. In such circumstances it is for the district court to decide whom to believe. Until a trier of fact decides between one side or the other, I cannot so easily dismiss the testimony favoring Hughes' position, especially when the district court specifically disbelieved Supt. Whitmer's explanation that Hughes' transfer was not a disciplinary measure.

B. *Unrelated to First Amendment Activities*

The majority's second factual conclusion was that Hughes' first amendment "whistle-blowing" activities were wholly unrelated to the decision to transfer him. The majority makes the point that Supt. Whitmer and Maj. Hoffman did not even know about Hughes' allegations that his superiors were covering up police brutality or ticket-fixing. But Lt. Elmore knew about Hughes' involvement in these incidents and he spoke to Supt. Whitmer about Hughes' "controversial activities." It was at that meeting that Supt. Whitmer told Elmore that the Hughes "problem" would be resolved. Besides, Supt. Whitmer testified that he had delegated much of the responsibility for the development of this decision to the command staffs of Troop "G" and Patrol Headquarters. Tr. 272. What is certain, however, is that Supt. Whitmer did know about Hughes' political activities as well as Hughes' Mountain View Airport investigation and the state legislator's reaction to it.

The majority also states that the dissension was wholly unrelated to these activities. Therefore, the majority concludes that because the transfer decision was based solely on the dissension in Troop "G," Hughes' purported whistle-blowing activi-

ties could not have entered into the transfer decision. I would agree that the dissension was not caused by Hughes' first amendment activities. Rather, the dissension was caused by the decision to transfer Hughes, and the decision to transfer Hughes was based on Hughes' first amendment activities. This is an important distinction and it is the basis for my difference of opinion with the majority. The majority also asserts that Hughes was not fired for whistle-blowing because he never told anyone about his investigations. Hughes' evidence is to the contrary. According to Hughes, he told Capt. McKee, Lt. Hickman, and a member of the Crime Commission about his investigations. The majority also claims that Hughes' transfer was unrelated to his Mountain View Airport investigation because Hughes' superiors never interfered with the investigation and even encouraged it. Besides, Hughes' investigation did not uncover any illegal activity. This reasoning misses Hughes' point that he was punished for *initiating* a legitimate investigation which angered a local politician, and not necessarily for what that investigation might have revealed. The majority, however, has chosen to accept Supt. Whitmer's testimony that the state legislator's complaints had nothing to do with Hughes' transfer. Again, it is my opinion that this choice should be made by the trier of fact.

Finally, the majority substantially underestimates the impact of Hughes' first amendment political activities on the Patrol's decision. This type of activity merits considerable first amendment protection. *See Barrett v. Thomas,* 649 F.2d 1193, 1199 (5th Cir.1981). The majority opinion does mention that the Patrol had a legitimate grievance against Hughes for his *"on the job"* association with Trieman and for spending too much time patrolling the area in which Trieman lived when that area was already patrolled by another trooper. Hughes' Disciplinary Report, however, is the best statement of the reason why the Patrol did not like Hughes' *off-duty* political association with Trieman:

Trooper Hughes has made a practice of patrolling east of Willow Springs in the

Mountain View and Summersville area *when no other person was working that area* from Zone 1. *We approved of this practice* due to the fact that *the area needed attention,* and our member was able to make a great number of arrests and warnings in this area. After a period of time, our member became closely associated with a wealthy industrialist in the Mountain View area. We welcomed the fact that our member was being helpful to a man who was giving great financial assistance by providing industry and jobs to the residents of the Mountain View area; however, it soon became apparent that Hughes was friendly with the businessman due to the fact that he was attempting to become Superintendent of the Missouri Highway Patrol and was hopeful that his friend could assist him. Hughes did not succeed in becoming Superintendent; however, he has left the impression with some members of Troop G that he has strong ties with people in high places.

Disciplinary Report at 3, ¶ 2 (emphasis added). Additionally, the Patrol was willing to stipulate at trial that there was nothing improper about Hughes' on the job association with Trieman. Tr. at 116–17. Both the testimony at trial and Hughes' Disciplinary Report are replete with references to Hughes' off-duty political activities and associations. This is a strong indication that Hughes' legitimate off-duty political activities and associations were a substantial motivating factor in the decision to transfer Hughes.

## III. THE LAW

In reviewing a public employee's claim that he has been punished for engaging in first amendment activities, the court must address three major issues:

(1) Has the plaintiff met the initial burden of proving that he was engaged in activity protected by the first amendment? *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) (*Pickering*).

(2) If so, has the plaintiff met the burden of proving that his constitutionally protect-

ed activities were a substantial or motivating factor in the government's decision to take action against the plaintiff? *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (*Mt. Healthy*).

(3) If so, has the defendant met the shifted burden of proving that the same actions would have been taken against the plaintiff had the plaintiff not engaged in the protected activities? If so, the plaintiff's claim of first amendment retaliation will be defeated. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 416–17, 99 S.Ct. 693, 697, 158 L.Ed.2d 619 (1979) (*Givhan*).

### A. *The Pickering Balance*

In order to answer the threshold inquiry of whether the employee's activities are protected by the first amendment, the court must balance the government's interest in promoting efficiency and discipline against the employee's interest in speaking, gathering information, and engaging in political associations with others. The majority has concluded that the evidence in this case so heavily favors the Patrol's interests that Hughes' first amendment claim borders on the frivolous. I must disagree.

### 1. *The Government's Interest*

In my opinion, the majority decision is premised upon an overly deferential concern for the Patrol's interests in efficiency and discipline. For example, the majority opinion states that the government's interest in promoting efficiency is paramount to a public employee's first amendment interests. Such a notion is abhorrent to our nation's democratic ideals. It is also contrary to a long line of cases which hold that administrative efficiency is but one factor to be weighed in the *Pickering* balance and is by no means determinative. *See, e.g., Peacock v. Duval,* 694 F.2d 644, 647–48 (9th Cir.1982); *Porter v. Califano,* 592 F.2d 770, 773–74 (5th Cir.1979); *Bernasconi v. Tempe Elementary School District,* 548 F.2d 857, 862 (9th Cir.1977), *cert. denied,* 434 U.S. 825,

98 S.Ct. 72, 54 L.Ed.2d 82 (1977).[4] Additionally, in order for the government's interest in efficiency to carry any weight whatsoever in the *Pickering* balance, the inefficiency must have been caused by the employee's actions, not by the employer's *reaction* to the employee's first amendment activities. *See Monsanto v. Quinn,* 674 F.2d 990, 998–99 (3d Cir.1982). It would be anserine to permit the government to discipline its employees because of disruption caused by the government's repressive reaction to the employee's first amendment activities. I readily agree with the majority that Hughes' first amendment activities did not directly cause the dissension in this case. And therein lies the rub; without a causal relationship between the dissension and the reason for Hughes' transfer (his first amendment activities), the government's interest in efficiency carries no weight in the *Pickering* balance. *Id.*[5]

Nor can I agree with the majority's conclusion that the Patrol, as a "para-military" organization, must be accorded considerable deference both in its decision that an employee's first amendment activities have caused dissension and in exercising its discretion to discipline such an employee.[6] The fact that Hughes works for a law enforcement agency is relevant only to the strength of the government's interest *vis a vis* Hughes' first amendment interests. It is just one factor to be weighed in the *Pickering* balance, and it has no independent significance that would compel the judiciary to defer *a fortiori* to a law enforcement agency's decision that impinges upon first amendment rights. *Tygrett v. Barry,* 627 F.2d 1279, 1283 & n. 3 (D.C.Cir. 1980). The federal judiciary has a non-delegable duty to conduct an independent and "searching review of the factors asserted by the employer to justify the [discipline]. The purpose of such a review is to assure that those factors have been applied with the deference to be accorded first amendment rights." *Id.* at 1283.[7] The majority, however, takes the position that the Patrol has a substantial degree of discretion in conducting its personnel affairs and that, "under our constitutional tripartite division of powers," the courts are ill-equipped to meddle in these executive functions. *Supra* at 1417–1418.

The majority also quotes the Supreme Court's recent decision in *Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983), for the proposition that "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." However, the Supreme Court, in the same passage, went on to state that such is not the case when the employee has exercised her first amend-

---

**4.** *See supra* Dissenting Opinion note 3.

**5.** *See supra* Dissenting Opinion note 3.

**6.** The majority seems to imply that we should apply the clearly erroneous standard of review to the *Patrol's* "findings of fact." I cannot agree. If anything, we should view the Patrol's self-serving after-the-fact exculpatory statements with skepticism. The proper course this court should take is to apply the clearly erroneous standard of review to the trier-of-fact's findings. Because there are none in this case, I would remand the case to the district court. Also many cases have held that in the area of first amendment rights the court must view the government's self-serving after-the-fact justifications of its actions with studied skepticism. In doing so, the courts must exercise their independent judgment on the constitutional significance of the historical facts of the case. And in no event is the government's claim of dissension to be determinative in the *Pickering* balance. *See, e.g., Peacock v. Duval,* 694 F.2d

644, 648 (9th Cir.1982); *Monsanto v. Quinn,* 674 F.2d 990, 998–99 (3d Cir.1982); *Tygrett v. Barry,* 627 F.2d 1279, 1283 (D.C.Cir.1980); *Porter v. Califano,* 592 F.2d 770, 773–74 (5th Cir. 1979); *Bernasconi v. Tempe Elementary School District,* 548 F.2d 857, 862 (9th Cir.1977), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 82 (1977). I agree with the majority that dissension certainly did exist in Troop "G." I disagree, however, that we must defer to the Patrol's judgment that Hughes' transfer was appropriate in a constitutional sense, *i.e.,* that Hughes' first amendment activities caused the dissension and that the disabling effect of the dissension within Troop "G" outweighs Hughes' first amendment rights. *See also Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 1692 n. 10, 75 L.Ed.2d 708, and the discussion of the *Connick* holding *infra* at 1434–1435.

**7.** *See supra* Dissenting Opinion note 3.

ment rights in a manner which "more substantially involve[s] matters of public concern." *Id.* at 1692–93. Similarly in the past, the Supreme Court has stated that "we must presume that official action was regular and, if erroneous, can best be corrected in other ways"; but the Court was careful to note that such deference is only appropriate "[i]n the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights." *Bishop v. Wood,* 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–2080, 48 L.Ed.2d 684 (1976). In the present case, it is my opinion that Hughes' first amendment activities substantially involve matters of public concern. In this regard the holding of *Connick v. Myers* is inapposite; rather, *Givhan* is more on point. In *Givhan* the Supreme Court upheld the first amendment right of a public employee who speaks out "on a matter of general concern, not tied to a personal employment dispute but arranges to do so privately." *Connick v. Myers,* 103 S.Ct. at 1691 n. 8. Hughes' transfer was not tied to any personal employment dispute with his employer. According to Hughes, he was transferred for, among other things, privately informing his superiors that he was investigating possible wrongdoing by members of the Patrol, including Lt. Elmore, and for *instituting* investigations about possible large scale drug smuggling in the area. These are certainly matters of public concern, quite dissimilar to Connick's questionnaire. Thus, although the majority is correct in its assertion that the Patrol does have a large degree of discretion over its personnel matters, the Patrol may not abuse that discretion to stifle the first amendment rights of its employees. *Barrett v. Thomas,* 649 F.2d 1193, 1199–1200 (5th Cir.1981). And it is particularly within the judiciary's ken to stop the executive from exercising its powers in an unconstitutional manner. *Cf. Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 175–76, 2 L.Ed. 60 (1803). Civil law enforcement is not sufficiently similar to military combat service that the judiciary should abdicate its duty to safeguard first amendment rights. *See*

*Barrett v. Thomas,* 649 F.2d at 1198–99 & n. 9; *Tygrett v. Barry,* 627 F.2d at 1283 & n. 3; *Gasparinetti v. Kerr,* 568 F.2d 311, 315 n. 16 (3d Cir.1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978); *Hanneman v. Breier,* 528 F.2d 750, 754 (7th Cir.1976). As the Supreme Court has so forcefully stated: "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights," particularly first amendment rights. *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967).

### 2. *Hughes' Interests*

Conversely, the majority has given short shrift to Hughes' first amendment interests. First, the majority fails to take into account Hughes' significant interest in freely associating with others, both politically and socially. The majority does not even mention Hughes' political associations and activities in its discussion of Hughes' countervailing interests, except to intimate that Hughes' association with Trieman was limited to improper on-the-job association. As noted above, the Patrol's own records show that Hughes' on-the-job presence in Mountain View was needed and appreciated. Rather, it was Hughes' off-duty association with Trieman that concerned Hughes' superiors. *See supra* Dissenting Opinion at 1432–1433. The importance of the first amendment right to political association should not be so lightly regarded.

The majority's conclusion also undervalues the social worth of Hughes' investigations into the alleged misconduct of his superiors. Hughes' activities were not merely internal or personal squabbles with his superiors, but rather were aimed at matters of significant public concern. *See Connick v. Myers,* 103 S.Ct. at 1689–91. Hughes' investigations of Lt. Elmore's son's drug involvement did not relate solely to Elmore's son. They were also concerned with Lt. Elmore's possible complicity through leaking information about the investigation to his son. The public has a compelling interest in knowing if their offi-

cials are guilty of misconduct. *Id.* at 1690–91; *Atcherson v. Siebenmann,* 605 F.2d 1058, 1063 (8th Cir.1979). Hughes' membership in the Patrol places him in a unique position to investigate and expose acts of misconduct within the Patrol. As such, Hughes' investigatory activities deserve substantial protection from retaliatory actions by the Patrol. *Pickering,* 391 U.S. at 572, 88 S.Ct. at 1736; *Atcherson v. Siebenmann,* 605 F.2d at 1063 ("[T]he creation of disharmony cannot be so feared as to silence the critic who would inform the public of this misbehavior by public officials."); Redish, *The Value of Free Speech,* 130 U.Pa.L.Rev. 591, 611–16 (1982).

In my view, Hughes' first amendment interests are quite substantial. Of course, federal courts should not underestimate the disruption that can be created by an employee's first amendment activities. But the first amendment is not "short-sighted." The first amendment's purpose is to guarantee that "the long term gains of robust debate" are realized. *Porter v. Califano,* 592 F.2d at 779. Just as the public weal demands that police carry out their duties efficiently, the public weal also demands that the police discharge their duties in an honest and competent manner. To ensure that public officials fulfill their duty to the public, the public must be informed of official misconduct. *Williams v. Board of Regents,* 629 F.2d 993, 1003 (5th Cir.1980) ("The falsification of an official document by one official for the protection of another official is such a grave miscarriage of the public trust that such conduct must be disclosed to the public if the *people* are to remain the true sovereigns in this country."), *cert. denied,* 452 U.S. 926, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981). This case illustrates the short-sighted and debilitating fallacy that regimental efficiency must be placed above freedom. The record shows that the initial decline in morale at Troop "G" was not caused by Hughes' activities. Rather, it was the command staff's reaction to Hughes' activities that caused the troopers to feel uneasy. In fact, morale has worsened since Hughes' departure. The record is replete with testimony of troopers'

fear of speaking against their superiors. The troopers have been pressured into sheepish compliance and no longer feel free to enforce the law equally against all persons. Tr. at 156–57, 160, 171, 173–74, 177. Indeed, at least two state officials have used the Hughes transfer as a means to quash dissent. Tr. at 157, 320–21, 391. The majority has ignored this effect on the other troopers in weighing Hughes' first amendment interests. Instead, the opinion in effect holds that because Hughes' activities caused dissension, *ipso facto* the Patrol's interests must prevail. Yet, the first amendment "requires the government not just to show that certain employee speech injures the government, but to show that the benefits of preventing the injury actually outweigh the profound benefits of free speech in this society." *Porter v. Califano,* 592 F.2d at 779. Here the chilling effect of the Patrol's reaction to Hughes' "upstart" activities is readily apparent. It is also readily apparent that there is still dissension and disruption within Troop "G." But dissension and disruption are often "the price the first amendment exacts in return for an informed citizenry," *Monsanto v. Quinn,* 674 F.2d at 1001, and they are often the regrettably necessary catalysts for reform aimed at increased governmental accountability and efficiency.

### B. *Substantial Motivating Factor*

The majority opinion states that "Hughes' transfer was wholly unrelated to his purported corruption exposing activities because there was no proof that Hughes' allegations were true, there was no showing that Hughes told the Patrol's command staff about his investigations, and the evidence clearly showed that Supt. Whitmer or Maj. Hoffman never knew about or interfered with Hughes' investigations. Besides, the majority says, the real reason Hughes was transferred was to quell dissension and the dissension was only tangentially related to Hughes' investigations. As mentioned above, this reasoning misses Hughes' point and disregards Hughes' portion of the record evidence. Hughes introduced probative

evidence that he did tell others about his investigations and that through Lt. Elmore this information reached Supt. Whitmer and those to whom Supt. Whitmer delegated responsibility in this matter. At the very least Supt. Whitmer knew about Hughes' investigation at Mountain View Airport and about Hughes' investigation of Lt. Elmore and his son. Supt. Whitmer also knew about the state legislator's and Lt. Elmore's bitter reaction to these investigations. I also find it irrelevant that Hughes' investigations might not have exposed any real wrongdoing or that Hughes did not publicly announce the results of these investigations. What is important is that there is substantial evidence that shows Hughes was transferred for *initiating* these investigations. Investigation is the first step in exposing governmental misconduct. It is also the stage of the first amendment process that can be quashed most easily.

More importantly, the majority never weighs Hughes' political associations and activities in its *Pickering* balance, although the record shows that Supt. Whitmer also knew about these activities and knew how his command staff felt about Hughes' involvement with "known politicians." The majority opinion does not take Hughes' political association into account because it concludes that Hughes' off-duty political association with Claud Trieman was not a " 'motivating factor' behind the transfer decision, let alone the 'but for' cause of the transfer decision," *citing Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. *See supra* Majority Opinion at 1424. Insofar as this statement holds that a *plaintiff* bears the burden of proving that his first amendment activity is the "but for" cause of the government's sanctions in order to prevail, I must disagree. The plaintiff in a first amendment retaliation case need only show that his first amendment activity was a substantial, or a motivating factor in the government's decision to impose sanctions on him. *Mt. Healthy,* 429 U.S. at 287 & n. 2, 97 S.Ct. at 576 & n. 2. Once this is done, the government has the burden of proving that it would have taken the same action if

the plaintiff had not engaged in first amendment activity. In light of the Disciplinary Report which spells out Hughes' off-duty political associations as one of the reasons why he should be transferred, it seems plain that Hughes' political associations were at least a motivating factor in the Patrol's decision to transfer him.

As a final matter, it must be noted that the district court chose to disbelieve the Patrol's proffered reason for Hughes' transfer. Instead, the district court found, as fact, that Hughes' transfer was a disciplinary measure. Hughes' Disciplinary Report lists Hughes' investigations and political association with Trieman as the principal reasons why Hughes should be disciplined. Thus, the district court's finding lends added credence to the conclusion that Hughes' first amendment activities were a substantial motivating factor in the Patrol's decision to transfer Hughes.

### C. *The Patrol's Rebuttal*

Once it is determined that Hughes' first amendment interests outweigh the Patrol's interests in efficiency and discipline, the Patrol may not take a second bite of the apple by asserting Hughes' transfer was necessary because Hughes' presence in Troop "G" created intolerable disruption and inefficiencies within the Patrol. This is especially true in light of evidence that shows the dissension was originally created by the command staff's reaction to Hughes' first amendment activities. In presenting a rebuttal argument, the Patrol may rely only on Hughes' recent, non-protected activities. *Waters v. Chaffin,* 684 F.2d 833, 839 (11th Cir.1982). The present record reveals no such activities that would make a remand fruitless.

### IV. WHY A REMAND IS NECESSARY

The majority cogently points out that "[f]ree speech claims are not to be considered in a vacuum, but must be viewed in light of the circumstances and in context with all relevant conditions existing at the time of the asserted free speech activities."

*Supra* at 1425. I could not agree more. This court has repeatedly emphasized that it cannot and will not review sensitive first amendment issues *de novo*. *See, e.g., Nathanson v. United States,* 702 F.2d 162, 165 (8th Cir.1983); *Brockell v. Norton,* 688 F.2d 588, 593 (8th Cir.1982). The primary reason why I have explored Hughes' evidence in such detail is to show that there still remains a sharp dispute on the facts. The majority, after a thoughtful reading of the record, has adopted the Patrol's version of the truth, and I have presented Hughes' version of the truth. The only way this dispute can be resolved is to have the trier of fact make the necessary credibility determinations and findings of fact. I must emphasize that this does not mean that I accept Hughes' "facts" as proven and true. Truth is subjective. In our trial system of dispute resolution, the official "objective" factual truth is a matter for the trier-of-fact to decide. I would leave the initial task of finding the "objective" factual truth in this case to the district court. A court of appeals is just not able to make credibility determinations from a faceless record. *See British Airways Board v. Port Authority of New York,* 558 F.2d 75, 82 (2d Cir.1977) ("Basic tenets of fairness require that a federal appellate court should not consider an issue involving questions of fact not resolved below."). The great disparity between the majority's reading of the record and my reading of the record highlights this truism.

Recently, the Second Circuit grappled with a similar situation. In *MacFarlane v. Grasso,* 696 F.2d 217 (2d Cir.1982), a National Guardsman claimed that he was denied an appointment (promotion) as a stock control officer in the Connecticut Army National Guard. Among other causes of action, the Guardsman alleged that the denial was in retaliation for his exercise of his first amendment rights. It seems that the guardsman wrote a letter to Governor Grasso defending himself against charges that he "buzzed" a nuclear submarine during a training flight. He also addressed letters on the same subject to a Major General Freund within the Guard, the Inspector General of the First United States Army, and the Office of Army Inspector General in Washington, D.C. These letters also complained about the treatment he received from Major General Freund in processing his defense against the "buzzing" charge. The Guardsman also made an oral complaint to an official of the National Guard Bureau.

Subsequently, the Guardsman applied for a promotion with a battalion at Groton, Connecticut. His application was reviewed by Adjutant General Freund (the man he complained to and about in his letter campaign to clear the submarine "buzzing" charge). The application was denied and the Groton depot told the Guardsman that he would not be appointed because the battalion had a policy of promoting from within. The Guardsman sued.

The district court dismissed the first amendment charges for failure to state a claim. The district court said the Guard would have rejected the Guardsman's application without regard to his speech due to its policy of promotion from within. On appeal the Second Circuit reversed and remanded on the first amendment issue. The court stated that even though there was a strong indication that the Guard's policy of promoting from within would meet the *Mt. Healthy v. Doyle* rebuttal test, the Guardsman still deserved an opportunity to offer his proof as to whether his internal communications were protected speech. This was true even though the plaintiff was a member of a military organization and only spoke about members of that organization to other members of that organization. The court further held that the Guardsman did not give up his first amendment freedoms upon joining the military and that he had the right to have the district court make findings on his first amendment allegations. *See MacFarlane v. Grasso,* 696 F.2d at 224–25.

An analogous situation exists in the present case. As in *MacFarlane,* Hughes, a member of a para-military organization, made disparaging remarks about fellow members of that organization to other

members of that organization. As in *MacFarlane,* Hughes' allegations should be aired and resolved in the first instance by the district court. Hughes' allegations that his transfer was ordered in retaliation for his political association and investigatory activities also deserve first amendment scrutiny by the trier of fact. Accordingly, I would adhere to our previous precedent and remand this case to the district court for findings of fact on the first amendment issue. *See Brockell v. Norton,* 688 F.2d at 593–94.