COMMONWEALTH OF KENTUCKY–
TRANSPORTATION CABINET; De-
partment of Vehicle Regulation; Norris
Beckley; William Breeden; Melvin
Shirley; Bill Newby, Appellants,

v.

John WHITLEY; Kentucky Personnel
Board, Appellees.

97–SC–000677–DG.

Supreme Court of Kentucky.

Oct. 15, 1998.

Edwin A. Logan, Logan & Gaines, Frank-
fort, for appellant.

C. David Emerson, Emerson & Associates,
Lexington, James M. Herrick, Emerson &
Bayer, Frankfort, Steven G. Bolton, Frank-
fort, for appellee.

GRAVES, Justice.

Appellee, John Whitley, a Transportation
Cabinet Officer, was charged by the Depart-
ment of Vehicle Regulation with discourtesy,
improper public statements, and conduct un-
becoming of an officer. After review by the
Kentucky Motor Enforcement Board of Ap-
peals, Whitley received an eight-day suspen-

sion from duty and pay. The Franklin Circuit Court dismissed Whitley's complaint and entered a judgment upholding the eight-day suspension. The judgment was appealed to the Court of Appeals, which affirmed the four-day suspension for discourtesy, but reversed the four-day suspension for improper public statements, holding that it violated Whitley's First Amendment right to free speech. Appellant, the Transportation Cabinet, thereafter sought discretionary review in this Court. After reviewing the record and hearing oral arguments, we reverse and reinstate Whitley's entire eight-day suspension.

## I. *Facts*

Whitley was employed by the Division of Motor Vehicle Enforcement, Department of Vehicle Regulation, Transportation Cabinet, as a uniformed officer. On October 25, 1994, at approximately 6:32 p.m., Whitley interrupted a radio conversation between an emergency operator and the Station for the Radio Amateur Civil Emergency Service in Lexington, Kentucky. The public broadcasting frequency over which he spoke transmitted throughout all of central Kentucky and was monitored by hospitals, Red Cross, Kentucky Disaster and Emergency Services, Amateur Radio Emergency Services, local radio and television stations, as well as many other amateur radio operations. With respect to a recent fatal accidental shooting of a Lexington youth by a member of the Lexington Police Department, Whitley stated that "the police had murdered the man" and "the Lexington police murdered the boy." Perhaps in order to give credibility to his statements, Whitley identified himself not as John Whitley, but as a police officer working for the Department of Transportation.

The following day at approximately 5:39 p.m., Whitley again broke into a conversation over the radio and, described by listeners as enraged, reasserted his allegations stating, "the police murdered the boy, they murdered the kid, he was holding his hands over his head, they just murdered him and that ain't no accident, that's murder, they murdered him." Whitley later admitted that he had not been on the accident scene either before or after the shooting. Whitley's statements,

which occurred at a time of extreme unrest and rioting in the Lexington area, led to the charges and his subsequent suspension.

Appellant, the Transportation Cabinet, argues that the Court of Appeals erred in finding that the suspension violated Whitley's right of free speech because the character of the speech in question does not rise to the level of protected speech under the First Amendment. Further, the Cabinet contends that the suspension was warranted absent any protected First Amendment conduct because Whitley's actions constituted conduct unbecoming an officer.

## II. APPLICABLE LAW

Defining the degree of First Amendment protection afforded to those who choose to work in the public sector requires a difficult balancing. On one hand, the public employer is no different than a private employer and can freely reprimand or dismiss employees for objectionable speech. On the other hand, the public employer is also an agent of the sovereign government and, as such, faces additional restrictions when sanctioning employees for their speech on matters of public concern. These additional restrictions derive from the First Amendment prohibition of government censure of speech.

The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as a sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 1888, 128 L.Ed.2d 686 (1994).

Historically, no distinction was made between public and private employees in the First Amendment arena, and thus public employees enjoyed no First Amendment rights beyond those afforded to private employees. *Adler v. Board of Education,* 342 U.S. 485,

72 S.Ct. 380, 96 L.Ed. 517 (1952). The justification was that when one is hired as a public employee, an implied condition of employment is the relinquishment of certain constitutional rights. However, in *Keyishian v. Board of Regents,* 385 U.S. 589, 605–606, 87 S.Ct. 675, 684–685, 17 L.Ed.2d 629 (1967), the United States Supreme Court held that the government cannot condition public employment upon the surrender of First Amendment rights. A year later, the Court in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the leading case on the free speech rights of public employees, reiterated its rejection of the notion that government employees must, as a condition of the employment, "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public concern ...." *Id.* at 568, 88 S.Ct. at 1734. (Quoting *Keyishian, supra,* at 605–606, 87 S.Ct. at 684).

In *Pickering,* the Court held that a public school teacher could not be dismissed for sending a letter to a local newspaper criticizing the school board's use of past tax revenues. Pickering's letter to the editor of the paper concerned the disproportionate allocation of school funds in favor of athletics over expenditures for educational programs. The school board dismissed Pickering on the grounds that his published letter was detrimental to the efficient operation and administration of the school system. In reaching its decision, the Supreme Court determined that the subject of Pickering's letter was "a matter of legitimate public concern" upon which "free and open debate is vital to informed decision-making by the electorate." *Pickering, supra,* at 571–572, 88 S.Ct. at 1736.

However the Court declined to grant blanket protection to all employee criticism. First, the *Pickering* doctrine does not extend protection to false statements that are knowingly or recklessly made. *Id.* at 574, 88 S.Ct. at 1738. Second, the Court held that due to the special nature of an employment relationship, conferring First Amendment rights upon public employees required that a balance be struck between "the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734–1735.

Although the *Pickering* Court declined to enunciate a uniform standard for all cases in which a public employee is sanctioned because of speech, it did indicate "some of the general lines along which an analysis of the controlling interests should run." *Id.* at 569, 88 S.Ct. at 1735. The factors weighing in favor of the State include its interest in maintaining discipline by immediate superiors, in perpetuating harmony among coworkers, in preserving loyalty and confidence when necessary to a particular employment relationship, and in discharging incompetent employees. *Id.* at 570–573, 88 S.Ct. at 1735–1737. Circumstances strengthening the employee's right to speak include the relationship of the speech to a matter of legitimate public concern, the public context in which the speech is made, the likelihood that the employee would have an informed opinion on the subject matter, and the ease of the state's ability to rebut the employee's charges. *Id.* at 569–573, 88 S.Ct. at 1735–1737.

In *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court later refined the *Pickering* balancing test. *Connick* involved the termination of an assistant district attorney who, upon learning she was being transferred to another division of the criminal court, circulated a questionnaire to fellow employees. The questionnaire concerned various aspects of the office, including the employees' confidence in their superiors and the pressure to work on political campaigns.

The *Connick* majority interpreted *Pickering* and its progeny to require that an employee's speech pertain to matter of legitimate public concern as a prerequisite for the balancing of relevant interests.

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the

judiciary in the name of the First Amendment.

*Id.* at 146, 103 S.Ct. at 1690–1691.

Thus, the threshold question was one of motive. If the employee's reason for speaking out could be characterized as involving "political, social, or other concern to the community," the employee's motive would be seen as stemming from his role as a member of the general public, and the speech would then be analyzed according to the *Pickering* balancing test. *Id.* On the other hand, if the employee's reason for speaking out amounted to a "matter only of personal interest," the motive would be deemed purely private and the speech would be unprotected. *Id.*

The *Connick* majority stated that whether the employee's expression touched on a matter of public concern must be determined by "the content, form, and context of a given statement, as revealed by the record as a whole." *Connick, supra* at 147–148, 103 S.Ct. at 1690. The Court did not elaborate upon this standard, but rather looked at the particular facts of the case to illustrate its application. The Court viewed all but one of the district attorney's questions as involving matters of a personal nature, stating that they were "mere extensions of Meyer's dispute over her transfer to another section of the criminal court." *Id.* at 148, S.Ct. at 1690. However, the Court did determine that one question regarding political campaigns was a matter of public concern. "[W]hether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Id.* at 149, 103 S.Ct. at 1691. As such, the next step was to balance the two parties' interests under the *Pickering* test.

After deciding that particular speech addresses a matter of public concern, the public employer must demonstrate that the efficient operation of the government agency outweighs the employee's constitutional right of free speech. *Pickering, supra.* The *Connick* Court broke this inquiry down into three parts. The first "requires full consideration of the government's interest in the effective and efficient fulfillment of its re-

sponsibilities to the public." *Id.* at 150, 103 S.Ct. at 1692.

"To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.

Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency."

*Id.* at 151, 103 S.Ct. at 1692 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974)).

*Pickering* enumerated several factors which allow a government employer to restrict an employee's First Amendment rights in order to operate efficiently. These factors include discipline by supervisors, harmony among co-workers, and the preservation of loyalty and confidence in working relationships in order to ensure the proper functioning of the agency. *Pickering, supra,* at 570–573, 88 S.Ct. at 1735–1737. The Court in *Connick* further noted that "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgement is appropriate." *Connick, supra,* at 151–152, 103 S.Ct. at 1692.

The second factor concerns the "manner, time, and place" in which the speech was delivered. *Id.* at 152, 103 S.Ct. at 1693. *See also Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979). If the manner, time, and place indicated that the employee was acting in a purely private capacity, the speech would be unprotected even though it touched on a matter of public concern. Finally, the last factor is the "context in which the dispute arose ." *Connick, supra,* at 153, 103 S.Ct. at 1693. In applying these factors, the *Connick* Court concluded that the district attorney's questionnaire touched only upon matters of limited public concern and did not require the State to

"tolerate action which [it] reasonably believed would disrupt the office, undermine [its] authority, and destroy close working relationships." *Id.* at 154, 103 S.Ct. at 1694.

### III. ANALYSIS

■ Applying the foregoing to this case, there can be no question that Whitley's speech could be characterized as involving "political, social, or other concern to the community," thus pertaining to a legitimate matter of public concern. *Connick, supra; Pickering, supra.* Whitley's statements concerned the shooting of a Lexington youth by police officers, an incident which had sparked great controversy and incited rioting throughout Lexington. As such, the burden shifts to the Transportation Cabinet to demonstrate that the efficient operation of its agency outweighs Whitley's constitutional right of free speech. *Pickering, supra.*

■ Under the *Connick* test, it is clear that there is a strong state interest in the efficient and effective operation of the Transportation Cabinet. The necessity of the state being able to properly perform its duties for the health, safety, and welfare of its citizens was reinforced in *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987) which held:

We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

These considerations, and indeed the very nature of the balancing test, make apparent that the state interest element of the test focuses on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest. (Citation omitted)

Working relationships among Transportation Cabinet employees, as well as between the Cabinet and related agencies, are crucial for the regulation of transportation through and around one of the largest metropolitan areas in the state, and ensuring the protection and safety of Lexington citizens. It logically follows that when a fellow law enforcement officer makes an unverified statement concerning a controversial and timely subject, it will result in dispute and tension within the department, jeopardizing co-worker relationships and disrupting the working environment. Such statements can destroy the loyalty and confidence between officers of the Transportation Cabinet and the Lexington Police Department, as well as other law enforcement agencies.

Moreover, statements such as Whitley's concerning other officers of the Commonwealth undermine the public's confidence and trust in law enforcement agencies of the state, affecting the entire Cabinet's morale, which further impedes the Cabinet's proper and efficient functioning. Certainly Whitley's credibility and reliability are impaired. Consequently, we are of the opinion that the Transportation Cabinet has a strong interest in the statements made by all of its employees in light of the foreseeable and probable damage to working relationships within the Cabinet and the Lexington Police Department, the impairment to Whitley's job performance, and the lack of credibility of the Transportation Cabinet, all of which are necessary for its effective and efficient functioning.

■ We note that the extent of damages caused by an employee's statements are not required to be proven by the governmental employer imposing the disciplinary action, rather only that the predictions that such harm might occur are reasonable. In applying the *Pickering* factors, the *Connick* Court held that the district attorney's First Amendment rights did not "require that Connick tolerate action which he *reasonably believed* would disrupt the office, undermine his authority, and destroy close working relationships." *Connick, supra,* at 154 (emphasis added). The Court did not demand specific evidence of such a disruption, but clearly stated that a reasonable belief that such a disruption would occur is adequate. *Id.* Such

predictions by employers have been given broad deference.

> [W]e have consistently given greater deference to government predictions of harm used to justify restrictions of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large. Few of the examples we have discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative .... But we have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern....

*Waters, supra,* at 673, 114 S.Ct. at 1887.

Due to the context at the time Whitley's statements were made and, more importantly by his identification of himself as an officer of the Transportation Cabinet, predictions of strife between law enforcement officers, tension with the Lexington police, and distrust by the public were reasonable conclusions of the Cabinet.

The second factor concerns the time, place, and manner of the employee's speech. Here, Whitley was aware that riots and public disturbances were occurring within the listening area as a result of the shooting incident. As such, he certainly should have known that his statements would tend to further incite discord and a continued breach of peace, especially coming from an officer whom people would reasonably believe to have the accurate facts. Moreover, the manner of Whitley's speech was neither informative nor educational, but rather delivered in a manner listeners described as "enraged", over a broadcasting frequency reaching a potentially large audience. By identifying himself as an officer with the Transportation Cabinet, many hearing his views would reasonably assume that they reflected the views of the Cabinet or even that he was speaking on its behalf. This gave a perceived credibility to his statements, further creating anxiety and controversy both internally within the Cabinet and also between the Transportation Cabinet and the Lexington Police Department.

Finally, the "context in which the dispute arose is also significant." *Connick, supra,* at 153, 103 S.Ct. at 1693. In *Pickering,* the employee was writing to the public to inform them on a current issue of relevance to the community. To the contrary, Whitley's statements were not aimed toward the peaceful education of the general public, but rather were recklessly aired across the radio at a time of high volatility. In fact, the allegation has been raised that because Whitley admitted he had not been present at the time of the shooting incident, his statements concerning such were recklessly or knowingly false.

Whitley's First Amendment right to make disruptive statements, such as were made in this case, are of minimal public or social importance when weighed against the necessity of the efficient and effective operation of the Transportation Cabinet for the protection of the citizens of not only Lexington, but the entire Commonwealth. The compelling interest of the Transportation Cabinet; the time, place, and manner of Whitley's speech; and the context in which the speech occurred satisfies the Cabinet's burden of proving that the efficient and effective operation of its agency outweighs Whitley's constitutional rights to speak on matters of public concern. *Pickering, supra.*

Accordingly, we reverse the decision of the Court of Appeals and uphold the entire eight-day suspension imposed by the Transportation Cabinet.

LAMBERT, C.J., COOPER, GRAVES, and JOHNSTONE concur.

WINTERSHEIMER concurs in result only.

STEPHENS, J., dissents in a separate opinion in which STUMBO, J., joins.

STEPHENS, Justice, dissenting.

Respectfully, I dissent.

There are several reasons why I would rule in favor of appellee in this matter. First, I believe that the type of disruption alleged by the Commonwealth is not within the ambit of impermissible conduct as defined by the *Pickering–Connick–Rankin*

test. There are nothing more than general assertions in the Commonwealth's brief. While deference to the Commonwealth is certainly due in making such a determination, I cannot in good conscience defer to the extent required here.

Even accepting the Commonwealth's interpretation of the type of injury required to support the action taken, the evidence is simply not present. Concrete proof of the injury is not required, but more than mere speculation is necessary. Here, the Commonwealth seems to rely on the fact that the situation was volatile, which it certainly was, as a basis for proving that an injury had occurred. However, the volatile situation has nothing to do with the likelihood of an injury being caused to the relationship between the Transportation Cabinet and the Lexington Police Department. Second, the organizational injury alleged by the Commonwealth is not envisioned by the *Pickering–Connick–Rankin* test. The injury alleged is not to the Transportation Cabinet's "efficient operations," but to its relationship (which is not explained any further) with the Lexington Metropolitan Police Department.[1] Government employers can discipline their own employees for disrupting the operations of the organization for which they work, but not for disrupting the operations of *other* organizations or relationships between organizations. *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). Finally, I disagree with the balancing test as performed by the majority. For these reasons, I would affirm the Court of Appeals.

I agree with the majority opinion except with its analysis of whether the state has met its burden of showing that its interests outweighed appellee's interest in free speech. The Commonwealth must show that appellee's speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the

speaker's duties or interferes with the regular operation of the enterprise." *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899, 97 L.Ed.2d 315. I believe that the Commonwealth has failed to make the necessary showing to sustain its burden.

## I. INJURY

The essence of any inquiry into statements made by a government employee, once a determination has been reached that the remarks were of a matter of public concern, is whether the statements substantially interfered the functioning of the organization which employs the speaker. *Id.* In the absence of an injury to the government entity, the only reason to discipline such an employee is to chill his ability to engage in protected First Amendment activities. *Id.,* 483 U.S. at 387, 107 S.Ct. at 2898, 97 L.Ed.2d 315 (employee who commented in regard to an attempt to assassinate President Reagan "If they go for him again, I hope they get him" was found to be protected by First Amendment because employee had a low level position and such speech was not inconsistent with her government mission).

Examining the factors enumerated in *Rankin* in light of the record in this matter, I believe it is clear that the evidence does not support the Commonwealth's claims. We must determine whether appellee's speech interfered with the regular operations of the Transportation Cabinet. *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899, 97 L.Ed.2d 315 (*discussing Pickering v. Board. Of Educ,* 391 U.S. 563 570–73, 88 S.Ct. 1731, 1735–37, 20 L.Ed.2d 811) (1968). The factors relevant in conducting this test are whether the speech creates disharmony in the workplace, impedes the speaker's ability to perform his duties, or impairs working relationships with other employees. *Shands v. City of Kennett,* 993 F.2d 1337, 1344 (8th Cir.1993). First, there has been no allegation that appellee's statements impaired discipline by superiors or harmony among co-workers within the

---

**1.** I assume that the Transportation Cabinet has a "relationship" with virtually every local, state and federal agency which operates in Kentucky. Based on the majority opinion, any employee who expresses a negative view of the activities of another agency with which a "relationship" exists, can be disciplined for that criticism. This broad interpretation unnecessarily chills free speech.

Transportation Cabinet. In fact, no allegation was made that any of appellee's fellow workers were even aware of his remarks, much less actually offended by them. Second, it appears that the close working relationships within the Transportation Cabinet were unaffected by appellee's remarks since no allegation has been made that they were negatively affected. Third, there is no claim that appellee's remarks in any way impeded his ability to perform his job. The final and only possible factor implicated in the instant case is whether the remarks interfered "with the regular operation of the enterprise." Once again, I believe a review of the record demonstrates insufficient evidence to sustain such a charge.

While the Commonwealth is not required to wait until chaos erupts and provide concrete proof of the negative impact of appellee's statements, more than mere speculation on their part is required to demonstrate the real possibility of injury. In this case, the only claim of injury is that the "allegations by Inspector Whitley affected the credibility and performance of his state agency and those statements would certainly not promote efficient public service or public trust within the Commonwealth. In this case, the statements made by Inspector Whitley were alleged to have impaired the administration of the very public service in which he is engaged ." While deference is certainly due to a public agency in making a determination of whether injury is likely to result due to certain remarks, this deference is not without discretion. *Connick v. Myers*, 461 U.S. 138, 152, 103 S.Ct. 1684, 1693, 75 L.Ed.2d 708 (1983). An employer must articulate the reasons for the judgment such that a court may evaluate it, deferentially or otherwise.

The Commonwealth has failed to offer even the most minimal level of detail with regard to what damage they are speculating occurred due to Whitley's remarks. In what way was the "credibility and performance" of the Transportation Cabinet affected? How did his statements impair "the administration of the very public service in which he was engaged"? Actual proof is not necessarily required, but more specific speculation would

be beneficial, and indeed required, to make such a finding.

It is permissible to fire a public employee for speaking on a matter of public concern if the employer had a reasonable basis for predicting that the speech would disrupt its operations. *Jeffries v. Harleston*, 52 F.3d 9 (2d Cir.1995). However, the public employer "cannot rely on purely speculative allegations that certain statements caused or will cause disruption to justify the regulation of employee speech." *Wulf v. City of Wichita*, 883 F.2d 842, 862 (10th Cir.1989). Furthermore, the government's concerns about the impact of speech must be reasonable and formed in good faith. *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Gardetto v. Mason*, 100. F.3d 803, 815–16 (10th Cir.1996).

Furthermore, "actual, material and substantial disruption must be demonstrated." *Roth v. Veteran's Administration*, 856 F.2d 1401 1407 (9th Cir.1988); *see also Allen v. Scribner*, 812 F.2d 426, 432 (9th Cir.1987) (disruption must be "real, [and] not imagined.") (*quoting McKinley v. City of Eloy*, 705 F.2d 1110, 1115 (9th Cir.1983). Mere allegations of interference with a working relationship cannot "serve as a pretext for stifling legitimate speech or penalizing public employees for expressing unpopular views ." *McKinley*, 705 F.2d at 1115; *see also Allen*, 812 F.2d at 432.

The Commonwealth also states that "[c]losing [sic] working relationships between governmental agencies, especially in law enforcement, are essential to fulfill the public responsibilities of health, safety and welfare to [sic] the citizens of the Commonwealth of Kentucky." While this is certainly a valid point, it has no relevance to the case at hand. Governmental agencies are permitted to discipline employees for disruptions caused within their own organizations, not disruptions caused in an organization in which they do not work. *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). Similarly, the fact that a governmental employee's remarks *may* lead to tension between two organizations is not a valid reason to permit the muzzling of an employee's first amendment right to speak.

In the instant case, the allegation is that appellee's remarks impaired the relationship between the Transportation Cabinet and Lexington Police Department, but there is simply no evidence to support that bare allegation.

## II. ORGANIZATION TO WHICH INJURY MUST OCCUR.

The majority opinion states that there is a "strong state interest in the efficient and effective operation of the Transportation Cabinet." Slip Op. at 10. I fully agree with this statement. The Commonwealth has a strong interest in the efficient and effective functioning of all of its operations. However, under *Pickering, Connick* and *Rankin* the focus is on the effect of the employee's remarks on the functioning of his *own* department, not other government departments.

In the instant case, there is no allegation that appellee's statements in any way impaired the functioning of the Transportation Cabinet. The allegation is that the relationship between the Transportation Cabinet, a state level agency, and the Lexington Police Department, a local entity, was disrupted by appellee's comments. The majority opinion seeks to expand the *Pickering–Connick–Rankin* test to encompass not just impairment of an agency's internal workings, but its external operations as well. I do not agree with this broad amplification of the law.

The Commonwealth cites *Hughes v. Whitmer,* 714 F.2d 1407 (8th Cir.1983) *cert. denied* 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984), for support that disruptions caused by protective speech are not immunized by the First Amendment. *Id.* at 1419. While *Hughes* is instructive, there is a important difference between it and the instant case. In *Hughes* the disruption was caused *within* the Missouri State Patrol. The Commonwealth is not alleging any disruption within the Transportation Cabinet. Accordingly, *Hughes* does not apply.

Under the rule as outlined by the majority, any governmental employee can be disciplined for making remarks critical of any local, county, state or federal organization which has a "relationship" with his agency, without defining what type of relationship is required, because of an allegation that the remarks *may* create tension in that relationship. Surely this is not what the majority intends.

## III. BALANCING OF STATE INTERESTS VERSUS FREE SPEECH.

To properly perform the balancing test, it is necessary not only to discern whether a state interest exists, but to then compare this interest with that of the individual's interest in free speech. With all due respect to the majority, I do not believe that their analysis in this area is adequate.

The nature of the government's burden to show disruption varies with the content of the speech. *Connick v. Myers,* 461 U.S. 138, 150, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983). The more tightly the First Amendment embraces the speech, the more vigorous the showing must be. *Id.* 461 U.S. at 150–52, 103 S.Ct. at 1692–93, 75 L.Ed.2d at 708. ("We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern."); *Roth v. Veteran's Administration,* 856 F.2d 1401, 1407 (9th Cir.1988); *Allen v. Scribner,* 812 F.2d 426, 432 (9th Cir. 1987); *see also Bernasconi v. Tempe Elementary Sch. Dist. No. 3,* 548 F.2d 857, 862 (9th Cir.1977) ("[T]he plaintiff's right to speak ought to be protected in consonance with the first amendment's primary concerns.") (quotation omitted).

In this particular case, as acknowledged by the majority, appellee's speech unquestionably involved matters of grave public concern. Accordingly, the burden borne by the Commonwealth in demonstrating the predominance of its interest is the highest one. I do not believe it has sustained its burden. Accordingly, I would affirm the Court of Appeals.

The potential for mischief created by the majority opinion is boundless because of its broad sweep. Under the rule announced by the majority, any employee of one governmental entity, local or statewide, can be disciplined for a negative comment which the

Commonwealth asserts will create "dissension" with another governmental body, be it local, state or federal. Since the majority has declined to explain precisely how "close" a relationship is required between two governmental bodies, public employees must now assume that any relationship is sufficient to support their possible termination for critical speech. This is a difficult case, but that is no reason to lend support to the old saying that difficult cases make bad law. I think that with this opinion the majority is making very bad law and this Court will be haunted by the breadth of this decision as we see the power to muzzle government employees used in an increasingly expansive manner.

STUMBO, J., joins in this dissenting opinion.